661 So.2d 643 (1995)
STATE of Louisiana In the Interest of DMH, Plaintiff-Appellee,
v.
DMH and JCH, Defendants-Appellants.
No. 27,807-JA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1995.
*644 Northwest LA Legal Services, Inc. by: Gary M. Skeen, James A. Vaughan and Ramona N. Wallis, Shreveport, for Defendants-Appellants.
James R. Phillips, Bossier City, for The Minor, DMH.
Davidson, Nix, Arceneaux, Jones & Askew by: James H. Askew, Shreveport, for Plaintiff-Appellee.
Before SEXTON, NORRIS and STEWART, JJ.
NORRIS, Judge.
The natural parents, MH (father) and JH (mother), appeal a judgment terminating their parental rights to the minor child, DH, pursuant to La.Ch.C. Art. 1015(5). For the reasons expressed, we affirm.

Factual background
DH was born in Shreveport on January 29, 1989. In June of that year his parents[1] voluntarily turned him over to the Office of Community Services ("OCS") because, as they reported to case worker Michael Ersoff at the time, they were both unemployed, living in their car and unable to care for him *645 properly. The baby was malnourished and covered with insect bites. Some acquaintances of the parents', Mr. and Mrs. Bagley of Haughton, took initial custody of DH. However, JH phoned Mrs. Bagley and came to see the baby only once over the next month, and declined Mrs. Bagley's offer to babysit for pay. Realizing that DH would be in need of care longer than she anticipated, Mrs. Bagley contacted OCS and the child was transferred to certified foster parents, Mr. and Mrs. Conklin of Bossier City, in mid-July.
Case workers testified that the initial goal was to work with the natural parents to reunite the family. However, the parents were not cooperative. Ms. Manwaring, the case worker, testified that they gave her an address at a motel where they could not be found. In early August she gave them a plan for reunification, which set out the following goals:
1. Both parents were to secure employment and maintain it until December 1990.
2. They were to get a stable home. Toward this goal Ms. Manwaring told them about various housing services and shelters.
3. They were to improve their care and concern for the well-being of the child.
4. They were to take parenting classes.
5. They were to maintain regular contact with the child. Ms. Manwaring set regular visits for twice a month at a time and place agreed to by the parents.
6. They were to improve their inadequate contact with OCS.
7. They were to improve their coping skills. Toward this goal Ms. Manwaring scheduled psychological exams for both.
8. They were to make a financial commitment to the child. They were to pay support based on their income.
The plan also advised them that their parental rights could be permanently terminated under certain circumstances.
In mid-August JH came to the OCS office and cursed Ms. Manwaring and another employee. This was only the first of several loud and verbally offensive confrontations. The parents missed their first scheduled family visit with DH on August 30, but came to OCS for a Family Team Conference and were uncooperative with Ms. Manwaring. On one occasion MH asked to speak to Ms. Manwaring's supervisor, Ms. Rice, and complained that Ms. Manwaring was not doing her job; he also advised Ms. Rice that he had phoned the Department of Social Services in Baton Rouge to lodge a formal complaint. However, the Baton Rouge office never received a call from him. Over the next several months MH and JH did not pursue the housing leads, did not make the scheduled appointments with the psychologist, and attended only three of the first nine family visits. Neither parent attended the parenting classes, although JH was pregnant with another child. In December 1989 they rented a house in Caddo Heights Subdivision in Shreveport, where they have lived ever since.[2] Ms. Manwaring was finally able to make a home visit late that month.
The second Family Team Conference was held on January 9, 1990, with neither MH nor JH attending. JH was in the hospital, having just delivered another son, "DVH." Ms. Manwaring visited her there and learned that MH missed the meeting because he was working. Ms. Manwaring's revised plan was similar to the original one, reiterating the need to take parenting classes, improve coping skills and increase contacts with OCS. A new goal was to prepare and stabilize their home for the newborn; OCS arranged to send a client service worker to the house to help them find free health care and transportation. JH said she understood the plan. Another new goal was for the parents to improve their personal hygiene. On January 10 Ms. Manwaring came to the house and explained the plan to both parents. MH, however, insisted that the client service worker would be his "maid"; he got angry and left. JH said she would do her best to get DH back. Despite these assurances, however, over the next six months the parents did not attend the parenting classes or the psychological evaluations; they kept only *646 three of 10 scheduled family visits, even though transportation was offered. At a home visit in early February 1990, Ms. Manwaring found the house a mess, with paint cans on the front porch within a baby's reach; DVH was dressed in only a diaper, despite the cool weather; and both parents' hygiene was still poor. After this, the parents usually would not come to the door when Ms. Manwaring knocked, or else they would answer and not let her in. Other times, unrestrained dogs in their front yard would dissuade her from entering the gate. In May 1990 Ms. Manwaring left OCS; on one occasion JH let her in to introduce the new case worker, Ms. Walker.
The third Family Team Conference was in July 1990; neither parent attended. The case plan noted that MH was employed and that the couple had obtained a residence. The plan still noted as problem areas the lack of parenting skills, lack of coping skills, inadequate regular contact with DH, and lack of cooperation with OCS, specifically the refusal of home visits. The plan advised that procedures for termination of parental rights were possible if the parents failed to improve in these areas. Over the next six months, the parents made five of 10 scheduled family visits (three visits were canceled because the foster parents went out of town and took DH along) and allowed the case worker to enter the house twice. They did not attend the parenting classes. They finally attended a psychological exam with Dr. Donita Gothard in October 1990.
Dr. Gothard, who testified at trial, did not render a specific diagnosis but found that MH was very insecure, lacked ego strength and self concept, was defensive, outgoing and strove to make a good social impression. Dr. Gothard stated that a person with these characteristics is not willing to look at his own behavior or responsibility, but blames others for his problems. The results with JH were similar: she was defensive, naive, impulsive and rebellious, unlikely to perceive cause and effect, and inclined to blame everything on someone else. Specifically, JH told Dr. Gothard the whole situation resulted from DH being in foster care, instead of her own lack of responsibility. Dr. Gothard testified JH could put her own interests before those of her child, thus placing the child in danger. Dr. Gothard's report suggested individual therapy for both parents, but OCS did not pursue this with her.
The fourth Family Team Conference was in January 1991. Again neither parent attended, although notice was sent. The plan noted their repeated failure to attend parenting classes and their erratic family visits. The plan reiterated the need for regular contact with OCS, including the need to let the case worker make home visits, and their need for better hygiene. Mostly the plan noted the lack of improved commitment to DH: there was inadequate bonding; the child felt uncomfortable around them; they never brought him any gifts; and they had never made definite plans to take DH back. Over the next six months the parents made about half of the family visits but never once permitted Ms. Walker to enter for a home visit. JH attended and completed the parenting classes in April 1991 and reported she was working at Shoney's. MH was again unemployed.
The fifth Family Team Conference was in July 1991. Both parents attended, but Ms. Walker testified they exhibited an "explosive personality." MH called Ms. Walker by racial epithets[3] and told her supervisor, Ms. Rice, to shut up. Because of MH's apparent hostility to OCS workers, family visits were moved from the Bossier OCS office to the McDonald's on Benton Road. Ms. Walker cited continuing problems with parenting skills and inadequate regular contact with DH. MH stated he was now self-employed earning $2,000, a claim he would never verify.[4] Ms. Walker also discussed with them the filthy condition of their house; she asked them to get the house and dogs sprayed for fleas and other bugs, and to make it generally more sanitary. At the next home visit on September 19, Ms. Walker found the house still crawling with bugs. Around this time, MH finally attended parenting classes.
*647 The parents' refusal to cooperate reached a climax in October 1991 during a family visit at McDonald's. MH noticed a bruise on DH's face and felt that the foster mother had inflicted it. He became very abusive, roared a string of racist and sexist epithets at Ms. Walker, and threatened that she would be "a dead woman in six months." JH also threatened to strangle her. Ms. Walker grabbed the child and attempted to leave, but MH blocked her van with his car. After this, in the interest of her own safety, Ms. Walker required all family visits to be held at the OCS office, and she terminated all home visits. At a subsequent family visit in November, Ms. Walker called the police because JH started using loud, profane language with her.
In late October, according to Ms. Walker, OCS decided to change its goal from reuniting parents with child to termination of parental rights. Ms. Rice explained that the McDonald's incident was only the "straw that broke the camel's back," and after months with little improvement, the parents were not conducting themselves in a manner consistent with reuniting with the child.
The parents nevertheless attended a second psychological evaluation with Dr. Gothard in November. Her findings were not very different from the first time; MH was likely to take offense at perceived slights and become assertive; she found this consistent with his spotty employment record. As for JH, Dr. Gothard again found hostility, aggressiveness, impulsiveness and "a short fuse." She recommended that OCS workers not make home visits, and expressed grave reservations about placing DH back in their home environment. Dr. Gothard wrote a report of this evaluation on December 1, but discovered that it contained a clerical error to JH's advantage. She therefore sent a corrected report on December 27, on which Ms. Walker noted, "This makes the assessment stronger." She denied speaking to any case worker about submitting the corrected report.
The next Family Team Conference was in January 1992, with the parents present; at this time Ms. Walker advised them that OCS would seek termination. They became so disruptive that Ms. Walker had to close the meeting. The plan stated the reasons for seeking termination: refusal to cooperate with OCS, refusal to allow access to the house for home visits, death threats and the terrible scene at McDonald's on October 16. OCS nevertheless continued to schedule family visits; at JH's request, these were moved to a different day to accommodate MH's work schedule. However, over the next six months, JH made three of 12 family visits; MH made only two. In March 1992 JH reported she was doing undercover work for the Shreveport Police Department; however, Ms. Walker inquired and found this was not true.
In July 1992 MH came to the OCS office to tell Ms. Walker and Ms. Rice that he was now willing to cooperate with the agency. He said he had a job interview at Gould Battery, he had got rid of the dogs, and was back on Lithium.[5] Ms. Walker made a notation in her records, "We can go ahead with termination of parental rights, or wait and see what the parents are going to do." However, DH then requested a new case worker because she (Ms. Rice) had been "fired" from another case. Ms. Rice would not assign a new case worker, however, simply on the client's request. Over the next six months, Ms. Walker changed family visit times twice to accommodate the parents; of 12 scheduled visits, MH attended none and JH, three. Ms. Walker did not consider this cooperating with the agency. Both were in and out of several jobs over this period. In late December JH brought the child a coloring book, crayons, spinning top and sketch board, all from JH's parents.
The next family team conference was in January 1993; JH attended, but not MH. Ms. Walker observed that JH always offered excuses for MH's failure to show up, and that she never brought her other son to a meeting. The parents continued to attend *648 roughly one-third of all scheduled family visits. In May and June 1993, OCS received two income assignment payments totaling $111.60 from MH's employer, Circle K.[6] Ms. Walker testified that OCS never received any voluntary contributions to DH's support. MH testified that when he quit Circle K, he assumed his next employer would withhold the amount. He admitted he has never informed OCS about any of his subsequent jobs.
OCS filed the instant petition to terminate parental rights in September 1993. MH and JH got married about a month afterward. For the remainder of the year, JH made five of seven family visits; MH made only two.
The next family team conference was in January 1994. JH attended but not MH. The plan reiterated the objective of termination for the same problems as before. Ms. Walker testified that prior to this meeting, MH's aunt said that his father and step-mother would perhaps be interested in taking the child; this alternative would have been less restrictive than foster care. However, JH later told her that MH's parents did not want him. From January through August 1994 (when the instant hearing was completed), there were 13 scheduled family visits, of which JH made eight and MH made three. In March OCS intercepted a $678 income tax refund that was due to MH. Also in March JH brought DH a small toy jeep.[7]
The final family team conference was held in late July 1994, just prior to the completion of the instant hearing. Neither JH nor MH was present. The plan assessment noted that over the past few months JH had been visiting the child on a somewhat more regular basis than before, but her only contact with OCS was during family visits. Ms. Walker testified that the parents had not complied with the case plans, still showed no commitment to the child, refused to cooperate with OCS, and exhibited very unpredictable behavior.
The instant hearing spanned nine days between mid-April and early September 1994. In addition to the facts outlined above, DH's foster mother, Mrs. Conklin, testified that as soon as she and her husband learned that OCS was seeking termination of parental rights, they applied to adopt DH. She described how when DH first came to them, he was uncommonly quiet for a little boy. They eventually learned that he had a hearing deficiency; at age two they placed him in surgery to have tubes inserted in his ears. They also put him in a special speech and language school, and the Conklins work with him every day on this. At the hearing Mrs. Conklin testified he has made great strides in improving his speech and has only a ½% deficiency. She also described his close relationship with their other child, a four-year old girl. Dr. Gothard interviewed DH shortly before she testified. She found him bright, socially confident and well-adjusted. She observed excellent rapport between him and his foster parents, and predicted damaging results if he was removed from them.

Action of the district court
By written opinion the district court found that the State had met its statutory burden by more than clear and convincing proof that termination of parental rights is in the best interest of DH and that JH and MH are unfit parents. The court stated that it was greatly influenced by the testimony of Dr. Gothard. It found that despite their poverty and lack of education, the natural parents were quite bright, yet devious, unstable and self-centered, and they did not attempt to meet the State workers half-way. The court therefore rendered judgment terminating MH and JH's parental rights.
Counsel for the natural parents has appealed. Court-appointed counsel for DH, *649 who participated at trial mostly by aligning with the State, has neither answered the appeal nor filed a brief.

Applicable law
The grounds for involuntary termination of parental rights are set out in La.Ch.C. art. 1015.[8] The provisions relevant to this case are:
The grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
* * * * * *
(5) Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
As it pertains to the instant case, an "unfit" parent is defined in Ch.C. art. 1003(10)(b) as one who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services. Financial inability alone shall not constitute grounds for termination of parental rights. "Reasonable expectation of reformation" is not defined in the Code. However, jurisprudence under article 1015(5)'s predecessor, R.S. 13:1601 B,[9] held that a reasonable expectation of reformation exists if the parent has cooperated with state officials and has shown improvement, although not all the problem areas have been eliminated. State in Interest of LLZ v. MYS, 92-2975 (La. 7/1/93), 620 So.2d 1309. No expectation of reformation is found when the parent exhibits prolonged and consistent negligent behavior toward the child, or the parent exhibits "conduct such as mental or behavioral disorders" which cause the parent to refuse to cooperate with the authorities in addressing the needs of the child. Id.
The termination of parental rights is a severe and terminal action and to permit it the State must satisfy an onerous burden of proof. State in Interest of LLZ v. MYS, supra. The burden in a case based on a prior adjudication that the child is in need of care and on the allegation of parental unfitness is clear and convincing evidence. La. Ch.C. art. 1035; Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This burden, which is greater than the traditional "preponderance of evidence" burden in most civil cases but less than the stringent criminal standard of "beyond a reasonable doubt," means that the State must demonstrate that the existence of the disputed fact is highly probable, that is, much more probable than its nonexistence. Green v. ConAgra Broiler Co., 26,599 (La.App.2d Cir. 3/1/95), 651 So.2d 335, and citations therein.
A district court's factual findings in a parental rights termination case will not be set aside absent manifest error. State in Interest of SC v. DNC, 26,104 (La.App.2d Cir. 6/22/94), 639 So.2d 426, writ denied 94-1977 (La. 11/4/94), 644 So.2d 1061.

Discussion: Parental unfitness
The natural parents have not contested two elements of the State's case under article 1015(5), namely the provision of subsection (5)(a) requiring proof that one year has elapsed since the child was removed from their custody pursuant to a court order in a child in need of care proceeding, and the *650 provision of subsection (5)(c) whereby the State now recommends that reunification would not be in the best interest of the child. We observe that the record establishes these grounds by clear and convincing evidence.
By their second assignment of error, the natural parents urge the district court erred in finding them "unfit" as required in article 1015(5) by clear and convincing proof. In support they contend that they voluntarily entered into an agreement with Child Support Enforcement to pay support to the State as reimbursement for DH's foster care. They also urge it is inconsistent to find them unfit when DH's brother, born less than a year after DH was removed from the home, has never been removed or made the subject of child in need of care proceedings.
Financial inability alone is not grounds to terminate parental rights. JH testified that between 1991 and 1993 she had worked at seven jobs for roughly 22 months; and between DH's birth in January 1989 and the time of the hearing in April 1994 MH had worked at 10 jobs for a total of 24 months.[10] Admittedly both were in and out of work; throughout the period, however, MH's work was his excuse for missing the vast majority of family visits. Most of the jobs were at or near minimum wage; however, in March 1993 his income was enough to warrant a $177.25 per month child support judgment. JH also testified that through most of the period she drew food stamps of $203 per month and their house rent is $100 per month. And yet the parents never made a single voluntary payment to cover DH's expenses; all funds were obtained by garnishment or income tax intercept.
Even if we accept for purposes of discussion the natural parents' characterization of the income garnishment plan as voluntary, the evidence shows clearly that after this agreement MH stayed at his job for two weeks, made two payments, then quit the job and took no further action to advise the State of his employment. This is more indicative of an intent to avoid his obligation under the agreement than to provide for DH.
During the time of DH's foster care, JH did bring him a few toys (several of which were actually from her parents) and one article of clothing, and bought him a few fast-food lunches. While these were constructive gestures, they are much less than warranted by the natural parents' financial situation and do not suffice as "reasonably necessary food [and] clothing." On the record presented, the district court was not plainly wrong to find MH and JH unfit by clear and convincing proof as required by Ch.C. arts. 1003(10)(b) and 1035.
The natural parents also argue that they should not be found unfit because their other son, DVH, has never been removed from their home or made the subject of child in need of care proceedings. They have not shown, however, how their conduct with respect to DVH is relevant to their proven conduct with respect to DH. Moreover, the record shows that the natural parents seldom allowed case workers to enter their house to observe the conditions, and DVH was never taken along for family visits. It is possible that the State's failure to intervene on DVH's behalf results from lack of information, not from approval of JH's and MH's parenting. This argument does not convince us that the finding of unfitness is plainly wrong.

Every reasonable effort
By their third assignment the natural parents urge the district court erred in finding by clear and convincing evidence that the State had made "every reasonable effort" to reunite DH with them. In support they contend case workers only discussed housing alternatives with JH but did not take her to any of the shelters; that after the October 1991 incident at McDonald's OCS made no effort to give them a new case worker; that OCS did not offer them individual counseling as suggested in Dr. Gothard's initial report; and that OCS negligently allowed DH to bond with his foster parents instead of cultivating his relation with the natural parents. They contend that each of these is a deficiency *651 in the State's handling of the case and necessitates a reversal of the finding that the State made every reasonable effort.
The first point, that Ms. Manwaring should have led JH by the hand to a shelter, strikes us as an extraordinary requirement upon OCS. Simply giving her the information (which, according to Ms. Manwaring, JH already was aware of) was certainly reasonable. The second point, that OCS should have replaced Ms. Walker as case worker after the McDonald's incident, is completely meritless. Ms. Rice testified that she found the case worker had done nothing wrong, and the record supports this. The third point, failure to provide individual counseling, is creditable, as Dr. Gothard did suggest it as an "appropriate involvement" for JH and MH after the first evaluation. She added that OCS now occasionally provides this service, funds permitting, though at the time she believed it did not. However, 13 months later she re-evaluated both natural parents and testified, "the prospect for significant change is dim." There is no record evidence that Dr. Gothard still recommended counseling or felt that had it been provided, the parents would have improved.[11] On this testimony, and the totality of the facts presented herein, the district court was entitled to find by clear and convincing proof that individual counseling was not reasonably warranted.
On the fourth point, psychological bonding, the natural parents argue:
The state set up DH so that the Conklins are his psychological parents, and not fostering the bond which should have occurred long ago with [JH and MH].
Br., 5.
This assertion is completely without factual support. Ms. Walker testified that twice-a-month visits by natural parents are frequently enough to create psychological bonds, and Mrs. Conklin testified that she and her husband did not begin to regard DH as a potential adoptee until after OCS had independently decided to pursue termination as its goal. In point of fact, DH's long stay in foster care and his inevitable bonding with the foster parents resulted not from any sinister scheme on the State's part, but rather from the natural parents' dismal record of attending family visits, blocking home visits and refusing to cooperate with OCS workers. On this record, the district court was not plainly wrong to find by clear and convincing evidence that the State made every reasonable effort to reunite natural parents and child.

Reasonable expectation of reform
By their fourth assignment the natural parents urge the district court erred in finding by clear and convincing evidence that they had "no reasonable expectation of reform" as required by article 1015(5)(b). In support they assert that Ms. Walker testified "on several occasions" that OCS had second thoughts about terminating the appellants' parental rights, thus making the case like State in Interest of LLZ v. MYS, supra. They further allege that Dr. Gothard's finding that they were immature, together with the recommendation for counseling, should be construed as supporting a prospect of reform.
In State in Interest of LLZ, supra, OCS initially removed the subject child from her 16-year old mother because the mother was not properly caring for her. OCS initiated a program to reunite them. It turned out, however, that the mother herself was still in foster care in Illinois; she returned there, and missed several family team conferences in Houma. When the mother turned 18, she returned to Louisiana and made 10 consecutive family team conferences; however, OCS noted that she was not attending parenting sessions or counseling, and recommended adoption rather than reunification as the goal. Several months later, however, OCS reversed its position and decided to seek reunification. In response to OCS requests, the mother (with her husband) moved from cramped quarters into a large trailer and began attending weekly family visits without incident. When the child was five, case *652 workers observed the little girl was bonding with the mother. A year later, however, the mother missed two family team conferences without explanation, so OCS again reversed its position and filed a petition to terminate. The district court granted it, but the court of appeal and Supreme Court found that termination was inappropriate. The Supreme Court held that the mother's absences from the early family team conferences were justified under the circumstances; that there was no evidence of any refusal to provide food, clothing or shelter; and that the mother, through cooperation with OCS, had improved in some (but not all) the problem areas. These facts, the Supreme Court held, did not prove by clear and convincing evidence that the mother was "unlikely to reform."
At the outset, we must observe in the instant case that once OCS decided to seek termination, over two years after it took custody of DH, it never altered its goal, thus distinguishing it from the frequent goal changes found in LLZ, supra. Ms. Walker did testify that in July 1992 she noted, "We can go ahead with the termination * * * or wait and see what parents are going to do." This was shortly after MH had come to the office to claim he was now willing to cooperate with the agency. However, no cooperation was forthcoming; MH actually asked Ms. Rice to assign him a new case worker, and tried to influence her by saying he knew she had been "fired" from another case. In point of fact, this was the second time he had tried to manipulate the agency. He attended none of the next 12 family visits. He did not advise anyone when he changed jobs, thus foiling the income assignment. All of this lends support to the district court's finding that the natural parents were "devious"; much of their conduct was an effort to outsmart OCS. The objective facts are more persuasive, such as Dr. Gothard's opinion that the prospects of reform are dim, and the natural parents' persistent refusal to apologize to Ms. Walker for the death threats and racial epithets hurled in October 1991.
On this record there is no evidence that OCS unreasonably "stuck to their guns" and turned a blind eye to JH and MH's chances of reform. On the contrary, despite sporadic compliance with a few of OCS's requirements, the natural parents have exhibited neither cooperation nor improvement. The district court was not plainly wrong to find, by clear and convincing evidence, that JH and MH were not likely to reform. State In Interest of LLZ, 620 So.2d at 1317.

Conclusion
For the reasons expressed, the district court was not plainly wrong to find by clear and convincing evidence every element required under La.Ch.C. art. 1015(5). The judgment terminating JH and MH's parental rights to DH is therefore affirmed. Costs are not assessed. La.Ch.C. art. 406 A.
AFFIRMED.
NOTES
[1] MH and JH were not married at the time; they ultimately got married on October 30, 1993, approximately one month after the State filed the instant petition to terminate parental rights.
[2] JH testified that they moved into the house in December 1990 but according to Ms. Manwaring's records and testimony it was December 1989.
[3] DH and JH are white; Ms. Walker and Ms. Rice are African Americans.
[4] JH testified that MH was actually making $200 a month at the time.
[5] Apart from this comment, there was no evidence that MH suffered from organic mental disease.
[6] On cross examination MH admitted he was cast in judgment on March 22, 1993, to pay child support of $177.25 per month. This judgment, however, was not offered in evidence.
[7] Ms. Walker's written notes state that JH brought him the jeep in March 1992, but she testified it was in 1994. She also testified that at various, unspecified times, JH brought him a plastic truck, a stuffed animal (she called it "filthy"), a candy cane for Christmas, a puppet, writing table (sic; probably should be "tablet") shaped like an apple, chalk board, and a pair of red pants.
[8] By their first assignment, the parents contest the termination on grounds of abandonment, La. Ch.C. art. 1015(9). The district court, however, did not address this ground of the State's petition, thus in effect denying it. Cagle v. Spade Drilling Co., 325 So.2d 354 (La.App. 3d Cir. 1975), and citations therein. We therefore pretermit any discussion of that assignment.
[9] Repealed by La Acts 1991, No. 235, § 17, effective January 1, 1992. This legislation enacted the Children's Code.
[10] When the hearing concluded in early September, MH was still at the same job as he held in April, second-class burner at Beaird Industries.
[11] Dr. Gothard's written reports, though frequently quoted at trial, were not introduced in evidence.