709 So.2d 927 (1998)
STATE of Louisiana in the Interest of S.M., et al.
No. 97-CA-1896.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1998.
Writ Granted May 15, 1998.
*928 Anne Derbes Keller, Law Offices of Adams, Johnston & Oreck, New Orleans, for S.M., K.M. and J.M., Appellants.
Clarence Richardson, Orleans Indigent Defender Program, New Orleans, for Appellee, Nyress M.
F. Clayton Latimer, Department of Social Services, Bureau of General Counsel, New Orleans, for State.
Before PLOTKIN, LANDRIEU and MURRAY, JJ.
MURRAY, Judge.
In this appeal, brought on behalf of three minor children, we are asked to review the juvenile court's judgment that the permanence plan for these children is reunification with their mother, N.M. (hereafter referred to as "Mother"). We affirm.
Mother, who was 22 at the time the Permanent Planning Judgment was entered, lost her mother at age three. Until she was removed by Child Protection at age nine, she lived with her maternal grandmother, who she alleges beat her daily. She then lived with her paternal grandmother, R.D. (hereafter referred to as "Grandmother"), until she was twelve. At that time she began running away from home. At some point she was referred to New Orleans Adolescent Hospital. When she was released to Grandmother's care, she again ran away and did not return. She became pregnant with her first child at age sixteen, and gave birth to Keonte[1] in California on July 16, 1991. This child's father's whereabouts are unknown. Mother returned to New Orleans when Keonte was approximately six months old. Grandmother eventually took Keonte into her home, but would not allow mother to live with her. Mother became pregnant with her second son when she was seventeen, and gave birth to Shawn on November 2, 1992. Shawn's father has refused to acknowledge him to anyone except Mother. L. H., with whom Mother lived during her pregnancy, believed he was Shawn's father. Shawn lived with L.H.'s mother (hereafter referred to as "Ms. Edna"), whom he knows as his grandmother. Mother became pregnant once again when she was eighteen. She gave birth to a daughter, Jasmine, on June 13, 1994.
During her pregnancy with Jasmine, Mother began living with J.J. At J.J.'s insistence, Mother brought Keonte and Shawn to live with them. On January 10, 1996, Mother *929 called 911 because Shawn was not breathing. He was taken to Medical Center of Louisiana, where he was revived and stabilized; he remained in the hospital until January 24. Medical personnel noted that Shawn had lacerations, abrasions and contusions of the head, face, chest and pelvis as well as burns and healed burns in the genital area.
Detective Riles of the Child Abuse Section of the Emergency Services Bureau was notified of a possible incident of cruelty to a juvenile. He spoke to Mother, who agreed to make a statement. She told Detective Riles that she found Shawn standing in the bathtub when she arrived home earlier that day. When she questioned J.J. about bruises she found on Shawn, he told that her that the child had fallen. Later that evening J.J. called her to the bathroom and told her that Shawn was having an asthma attack. When Mother saw that Shawn was not breathing she attempted to perform CPR, and then called 911.
Mother stated that J.J. had been physically abusing her and Shawn since March of 1995. She described J.J.'s making Shawn sleep in the bathtub, and hitting him with his hands and, on one occasion, a bowl of food. She also related an incident in which Shawn had been burned with hot water. She stated that she did not tell anyone about the abuse because J.J. threatened to "take care of her" if she told, and she was afraid. Mother stated that she had seen J.J. punch Shawn in the chest and back earlier on the evening of the 10th. She denied that J.J. abused her other two children.
Detective Riles also questioned Keonte, who, along with Jasmine and Mother, had been brought to the Child Abuse Office. Keonte stated that J.J. hit him, and had put hot water on both him and Shawn. He told the detective that he had seen J.J. hit Shawn with his hand and his mother's shoe, and tie Shawn's hands. Physical examination revealed that Keonte had bruises on his chest and behind his right ear as well as old scars from belt marks on his buttocks. Jasmine had a bump on her forehead.
Mother was placed under arrest and charged with three counts of cruelty to a juvenile. She pled guilty and was sentenced to five years with the Department of Corrections on each count, to run concurrently. The sentence was suspended, and Mother was placed on five years active probation. As special conditions of probation, Mother was to serve twelve months, earn her G.E.D., and get training through the regional vocational technical school.[2]
A verbal instanter order placing the three children in the custody of the State of Louisiana was issued on January 11, 1996. On January 16, 1996, a judgment placing the children in the provisional protective custody of the State was entered. The State petitioned to have Keonte, Shawn and Jasmine adjudicated children in need of care. This petition was heard on May 15, 1996. It was stipulated that the children were abused/neglected children in need of care, and the court ordered that they be taken into protective custody. Care, custody and control of the children was given to the Office of Community Services (OCS). Shawn was to remain in the foster home where he was placed upon his discharge from the hospital; Keonte and Jasmine were to remain with Grandmother.[3]
A case plan goal for reunifying the children with their mother was developed by OCS. Following a review hearing on November 14, 1996, a judgment was entered continuing the children in the legal and physical custody of OCS and in their placements, finding that those placements were the least restrictive and in the children's best interest. The judgment provided for Mother's weekly supervised visitation with the children, and liberal sibling visitation. In addition, the court ordered that Mother participate in parenting classes and a "Battered Women's" program, submit to a psychological evaluation, submit to treatment as indicated and *930 fully participate in counselling and treatment consistently, obtain stable housing and maintain contact with OCS. A judgment entered on January 30, 1997, following a second review hearing, noted that Mother had been complying with the case plan and the court's orders, and continued the children in the custody of OCS and their placements. The judgment also set the matter for a Permanency Planning Hearing on July 31, 1997.
On that date the court heard testimony from Zelda Sereal of OCS and Mother. The court also reviewed the CASA report and the OCS report, with attachments. It then entered the Permanency Planning Judgment that is the subject of this appeal. That judgment continued the children in the custody of OCS and in their placements, and approved the OCS Permanency Plan, which was reunification. However, the court did not order that these children be returned to Mother immediately. Instead it concluded that reunification should be gradual and incremental, beginning with Jasmine, the youngest child. The court ordered that Mother continue to take those steps necessary to enable her to care for her children; she was to submit to psychotherapy, participate in family therapy with her children, and obtain stable housing, all to the court's satisfaction. When OCS felt that it was appropriate for Jasmine to be returned to Mother's care, it was to notify all counsel, and schedule another hearing. The court ordered that it, rather than OCS, was to have oversight of this case. These children will not be returned to Mother unless and until the court is fully satisfied that to do so is in their best interest.
The attorney representing the three minor children appeals the Permanency Planning Judgment, contending that reunification is contrary to the law and the evidence and not in these children's best interest. Counsel argues that the permanency plan should have been termination for the purpose of freeing the children for adoption.
The Department of Social Services and Mother have filed briefs in support of the trial court's decision. Each argues that there is not sufficient evidence to terminate Mother's parental rights. OCS contends that: "In view of the progress Ms. M. has made in complying with and completing several parts of her care plan, the decision to continue to work toward returning the children to her is the only Permanent Plan that is consistent with the mandates of federal, state and constitutional law." We agree.
The grounds for the involuntary termination of parental rights are set forth in article 1015 of the Louisiana Children's Code.[4] In order to terminate parental rights the State must prove every element of any one section of that article by clear and convincing evidence. La.Ch.C. art. 1035.[5]
The children's counsel argues that there was clear and convincing evidence proving grounds for termination under subsections (1) and (4) of the version of art. 1015 that was in effect at the time of this hearing. Either subsection requires the State to prove that the parent, whose rights it seeks to terminate, is unfit to retain parental control and that there is no reasonable expectation of his reformation in the foreseeable future.
Counsel contends that the evidence is overwhelming that Mother is unfit, and that she has not reformed in a manner that demonstrates a substantial change in the behavior that served as the basis for the removal of the children from her custody. Counsel points to Mother's past and current history of unstable relationships, financial irresponsibility, and lack of ability to care for her children. She notes that Mother does not seem to have benefitted from the parenting classes because she spanked one of the children during a supervised visit. Counsel argues that it is doubtful that Mother will ever be able to care for her children properly. She notes that Mother, even without the financial burden of these children, has not saved any of her earnings. The children's *931 counsel contends that the psychological evaluation, which found Mother's ability to parent children limited and expressed concern that she would be overwhelmed if all of the children were returned to her care at one time, supports her argument. Finally, counsel argues that rehabilitation, even if possible, cannot occur within a reasonable period of time so that these children's best interest would be served by freeing them for adoption.
The trial court disagreed. Following the July hearing the court determined that it would be legal error and not in these children's best interest to close the door on reuniting them with their mother. The court noted that it shared all of counsel's concerns for these children, stating that: "I have read the same reports that she has read." Despite those concerns, however, the court found that Mother had made significant improvement. Although there was still more improvement needed before the court was satisfied that the children could be returned to her, Mother had completed the parenting classes and the "Battered Women's" program, obtained her G.E.D., secured a job, submitted to a psychological evaluation, and attended three counselling sessions. She had done everything that the court had ordered except to continue in counselling and obtain stable housing.
A reasonable expectation of reformation exists if a parent has cooperated with state officials and has shown improvement, although all of the problems may not have been eliminated. State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1317 (La. 1993). Although counsel argues that Mother simply has "gone through the mechanics" without showing significant improvement, a court's findings as to whether a significant substantial indication of reformation has been shown and whether the parent is likely to reform will not be set aside absent manifest error. State in Interest of BJ, 95-1915, p. 15-16 (La.App. 1st Cir. 4/4/96), 672 So.2d 342, 351, writ denied, 96-1036 (La.5/31/96), 674 So.2d 264.
There is no question that these children have suffered because their mother did not protect them from abuse. There is also no question that Mother is poorly equipped to deal with her children. However, the record supports the trial court's conclusion that she has cooperated with OCS, and is making a sincere effort to do what is necessary to regain custody of her children. For these reasons we affirm the permanency plan to continue to work toward reunification.[6]
AFFIRMED.
PLOTKIN, J., concurs.
PLOTKIN, Judge, concurring.
I concur in the majority opinion, but write separately to address the facts of this case and the issue of reunification.
I believe the majority opinion glosses over the facts of this case. Mother did, indeed, have a tragic childhood. That is not what is at issue here, but rather, it is the safety and well-being of her children.
On January 10, 1996, Shawn was beaten so badly that he was pronounced D.O.A. by the police when they responded to the 911 call, and, again when he arrived at the hospital. He was miraculously revived by medical personnel, after what must have been an extended period of time. However, those parties seeking reunification focus on the fact that Mother called 911 and tried to revive Shawn. This is somehow supposed to lessen the fact that Mother allowed her boyfriend to beat Shawn severely for a prolonged period of time until he stopped breathing. They also seem to believe that Mother is somehow less culpable because she told the police what happened and was willing to plead guilty to cruelty to a juvenile.
Shawn and Keonte had scars and bruises from past beatings. This is a clear sign that the children were repeatedly abused and that Mother did not see fit to stop the abuse until Shawn was within inches of death. Furthermore, *932 Keonte told the police and social services that in addition to beating the children, Mr. Johnson often burned them with scalding water, made Shawn sleep in the bathtub, and made them stand for hours at a time in order to punish them. Keonte also stated that Mother beat him and Shawn, too. Therefore, Mother not only failed to protect her children, she took part in the abuse. Mother also admitted that Mr. Johnson convinced her to seek custody of all of her children in order to receive financial aid from social services. Until that time, Mother never had custody of all three children and never sought custody of all three children.
The majority correctly notes that Mother has complied with some of the mandates established by the juvenile court. However, she appears to only be going through the motions because the items she has completed are not long-term lifestyle changes, but rather, short-term courses she was ordered to complete.
She was ordered to enroll in, and successfully complete parenting classes. While she completed the course, I can hardly say that she did so successfully. She states that the course was unhelpful because it only addressed discipline and not how to raise children. And, as far as discipline is concerned, she states that she is trying to implement what she learned but that she is having difficulty because the discipline skills were geared towards older children. In fact, she admits that during a supervised visit with Keonte, she struck him. I do not belive she learned this at her parenting class. She was also ordered to enroll in and participate in a battered women's program. Although she never alleged being a battered woman, she states that she was afraid of Mr. Johnson. The purpose of the course was to help her assert herself and end her cycle of irresponsible relationships. This course seems to have been a waste of time as well. Within two months of her release from prison, Mother was pregnant with her fourth child. Currently, the relationship with the father has ended. Mother also enrolled in and completed a GED course. This has allowed her to seek employment. While she is employed, she has managed to save absolutely no money, even though she has virtually no expenses. This lack of savings means that she still has not obtained stable housing for herself and the children, which is also a court ordered requirement.
Also, Mother was ordered to receive counseling, individually and with her children. After her first visit, her therapist believed that she had minimal ability to care for her children. Also, her therapist believed that she may only be trying to regain custody of her children for the financial benefits she would receive from social services. Her therapist worried that the stress of a newborn child would make it impossible for Mother to adequately care for her children. Granted, this evaluation was made soon after Mother was released from prison, and before she attended any of her self-improvement classes. However, there have been no recent evaluations because Mother refuses to participate in counseling.
After Mother completes her individual counseling, she is supposed to attend family counseling with the children. This step in the reunification process is obviously not going to happen any time soon because of Mother's refusal to attend her personal counseling. Therefore, time will pass and the children will get older without stable housing and with the chance for adoption diminishing. Keonte and Jasmine have already been placed in alternative foster care because their maternal great-grandmother could no longer care for them. Now all three children are separated from each other.
Shawn and Keonte have attended counseling regularly. Their counselors note that they appear happy to visit with Mother. However, they also note that after the visits, they have increased anxiety. Also, Keonte becomes angry during the visits and Mother does not know how to control him, which resulted in her hitting him during one visit. Keonte also believes that he must protect Shawn and feels helpless when they are apart. He fears for Shawn's life because he witnessed the beating that left Shawn unconscious and not breathing. Both Shawn and Keonte suffer from sleep disorders which are more marked after their visits with Mother. Their therapists note that the children are *933 making progress and learning how to channel their anger and deal with their emotions. However, they are all adamantly against reunification with Mother. They strongly believe that the only reason the children are progressing is because of the stability provided by their foster parents and to force them to leave their environments would be catastrophic.
Counsel for the children believes that the trial court erred when it did not order the State to seek termination of Mother's parental rights and free the children for adoption. She specifically notes that La. Ch. C. art. 1015(1) and (4) could be implemented in this case to require termination. However, under either of those provisions, it must be proved by clear and convincing evidence that there is, "no reasonable expectation of his reformation in the foreseeable future." The State, the court, and counsel for Mother believe that because Mother has made some progress, there is a reasonable expectation for reformation in the foreseeable future. However, I believe that the "progress" that Mother has made is superficial, and does not indicate any hope for reformation in the foreseeable future. She completed short-term programs, but has made no lifestyle changes that would show a genuine desire for the permanent return of her children. Since her release from prison, she has gotten pregnant and had her fourth child; she has not found housing, but instead, lives with the mother of the father of her newborn; and she refuses to attend counseling. The children have been in foster care since January of 1996, thus, over two years have elapsed since their separation from Mother. As indicated by all involved, Mother is far from ready to have custody of all of her children because she still has months of individual counseling, followed by months of family counseling to attend. Reformation and reunification in the "foreseeable future" do not seem likely.
But, I am bound by the jurisprudence in this case which holds that unless there has been absolutely no progress, termination of parental rights is not a viable option. In State in the Interest of L.L.Z. v. M.Y.S., 620 So. 2d 1309 (La. 1993), the mother also refused to attend counseling which was a mandate of the plan for reunification. However, the court noted that she had frequent visits with the child and was sincerely trying to secure adequate housing, thus termination of parental rights was denied. That case established the test that we must follow: "a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated." Id. at 1317. See also, State, Through Dept. of Health and Human Resources, in Interest of CAB v. EB, Jr., 504 So. 2d 162 (La. App. 2 Cir. 1987); State in the Interest of GA, 94-2227 (La. App. 1 Cir. 7/27/95), 664 So. 2d 106; State in the Interest of DMH v. DMH, 27,807 (La.App. 2 Cir. 9/27/95), 661 So. 2d 643.
Currently, the juvenile court is monitoring this case with periodic updates on the status of all involved. I urge that court to watch this case closely, because the older the children get, the harder it will be to permanently place them if the plan for reunification fails.
NOTES
[1] In keeping with this Court's policy in juvenile cases we have used initials, first names, or other generic identifiers.
[2] J.J. also was charged with three counts of cruelty to a juvenile and the attempted second degree murder of Shawn.
[3] On August 30, 1996, Shawn was placed with Ms. Edna. Keonte and Jasmine remained with Grandmother until some time after the July 31, 1997, judgment, when they were placed in a foster home.
[4] Article 1015 was changed significantly during the 1997 Regular Legislative Session.
[5] Under the provisions of the Children's Code in effect at the time the State was required to prove facts under art. 1015(2) and 1015(3) beyond a reasonable doubt. As to all other grounds, the facts alleged must be proven by clear and convincing evidence.
[6] It may be that additional services will be needed in order to prepare Mother to accomplish the goal of reunification. For instance, additional parenting classes designed to correct specific deficiencies noted in the psychologist's reports and/or a program to teach Mother about basic money management may be helpful.