# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-591

**STATE OF LOUISIANA IN THE INTEREST OF J. S.R., Z. S.R., J. H., M. S.R., N. S.R. & J. S.R.**

************

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. JC-2017-0008
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

************

## SYLVIA R. COOKS
### JUDGE
************

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**David L. Wallace**
**P.O. Box 489**
**518 North Pine Street**
**DeRidder, LA 70634**
**(337) 462-0473**
**COUNSEL FOR APPELLANT/MOTHER:**
    **K. S.R.**

**Thomas W. Sanders, Jr.**
**State of Louisiana, Department of Children and Family Services**
**1919 Kirkman St.**
**Lake Charles, LA 70601**
**(337) 491-2067**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana, Department of Children and Family Services**

**COOKS, Judge.**

The appellant in this matter, K. S.R., asserts the trial court erred in terminating her parental rights to her five minor children.

The record established the State of Louisiana, Department of Children and Family Services (hereafter DCFS) became involved with the minor children beginning in September of 2016, when the mother was referred to DCFS. It was reported by DCFS that the children would break into other homes to steal food. The mother admitted she left a chair outside of their window so they could get back in the home. It was reported the children's clothing did not fit, were dirty and smelled of urine.

On November 8, 2016, DCFS closed an investigation as valid for Neglect-Lack of Adequate Supervision. DCFS received a report of ongoing domestic violence between the mother and her then boyfriend, in the presence of the children, and for which law enforcement became involved. The boyfriend was on parole and not supposed to be in close proximity to the mother, who was a prior victim of the boyfriend's violent behavior.

A Family Services Case Plan was begun on February 2, 2017. However, the mother refused to allow DCFS to visit the home and declined services. She also refused to implement an Impending Danger Safety Plan and would not allow her mother to be a safety monitor. As a result of the mother's refusal to cooperate, DCFS obtained an Entry Order in "furtherance of their investigation of the alleged abuse and/or neglect." Court ordered family services, including classes in domestic violence and parent education, were implemented on March 28, 2017. On August 15, 2017, the children were adjudicated Children in Need of Care and the family was court ordered to comply with a Family Services Case Plan. This continued until the children entered the State's custody on October 3, 2017.

The children were placed in the State's custody on October 3, 2017, after the tragic death of the mother's one-year old child. The record establishes on that date, one of the children, J.H., who was eight at the time, was playing, unsupervised, with a lighter he found on the couch, and lit on fire the blanket wrapped around his one-year old brother. The child was transported to the hospital, but ultimately died from his injuries. The mother was laying in the back bedroom with her boyfriend at the time of the incident. The boyfriend, Wayne Hammond, told police he had been smoking synthetic marijuana just prior to the incident when he and the mother went to bed. The mother took a drug screen that night and tested positive for cocaine. She was arrested and charged with negligent homicide, illegal possession of CDS Schedule I, improper supervision of a minor by a parent, second degree cruelty to a juvenile and illegal possession of CDS Schedule II. The mother entered a plea of guilty to negligent homicide and possession of CDS Schedule I. She was sentenced to five years at hard labor, two and one-half years suspended on each count, to run concurrently with each other. The mother spent eleven months in jail and was released from custody in September of 2018.

On May 15, 2019, DCFS filed a Petition for Certification for Adoption and Termination of Parental Rights. A hearing on the petition was held on June 25, 2019. There were four biological fathers of the five children and curators were appointed to represent their interests. The mother was represented at the hearing.

A review of the transcript reveals the trial court found the mother's credibility lacking, stating "I'm familiar with the circumstances surrounding why the children came into care, whether she wants to admit to those are not. It's arguably not helping her that she doesn't own up to some of these issues. . . ." The mother denied using drugs, although it was established she failed multiple drug tests. When questioned by the trial court concerning the multiple failed drug tests, the following exchange took place:

3

THE COURT: Let me, it's my understanding that it's your testimony that if there was a drug test showing [you're] positive for anything, you don't believe the drug test?

THE MOTHER: Correct.

THE COURT: So, all the drug tests are incorrect, because you have been clean, is that your testimony?

THE MOTHER: Correct.

At the conclusion of the hearing, the trial court found DCFS met its burden of proving by clear and convincing evidence that the termination of the mother's parental rights was in the best interest of the children.

The mother has appealed the judgment, asserting as her lone assignment of error that the "trial court was manifestly erroneous in terminating [her] parental rights."

## ANALYSIS

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Louisiana Children's Code Article 1035(A) requires the State to prove, by clear and convincing evidence, each element of a ground for termination of parental rights. After the State has met that burden of proof, the trial court must determine that termination is in the best interests of the children. *See* La.Ch.Code art. 1037(B). This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount over that of the parent. *In re J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are

unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id*. at 811 (citation omitted).

An appellate court reviews the trial court's findings as to whether a parent's rights should be terminated under the manifest error standard. *State in the Interest of K.G. and T.G.*, 02-2886 (La. 3/18/03), 841 So.2d 759.

In the instant case, the State's petition alleged termination of the mother's parental rights was appropriate pursuant to La.Ch.Code articles 1015(5) and 1015(6), which provides in pertinent part:

(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

. . .

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

5

A review of the trial court's oral reasons for judgment and the signed judgment indicate the trial court terminated the mother's parental rights in part because of her failure to provide any significant contribution to or on behalf of her children since they entered the State's custody on October 3, 2017. While the mother made a general assertion in brief that she was taking care of the needs of her children since she left prison, the following testimony belies that assertion:

Q. Do you feel as though your children have been in custody the past 18 months, you've provided for their needs entirely?

A. I've provided for their needs since I've been out of jail, which I've been out of jail since September.

Q. Okay.

A. I've been providing for them.

Q. Okay. Since you've gotten out of jail, you've provided for all their needs?

A. Yes.

Q. Nobody else was responsible?

A. I'm not aware of that.

Q. Okay. How much are we talking about on an average on a monthly basis that you've expended taking care of your five children that are in State custody. I know you can't out an exact to the penny number, but help me with an approximate number.

A. I'm gonna say about $100.

Q. Okay. About $100 a month to take care of five children?

A. I'm gonna say about $150, somewhere around that range.

Q. Okay. Do you feel like for $150 a month, the high side of what you've estimated that you could feed, cloth, take care of all the basic needs of your five children?

A. Not all five children are with my mother, it's just three of them with my mother.

Q. Okay.

A. And one is in Texas.

6

Q. Well –

THE COURT: His question was, how much have you contributed on an average each month for the care of your children, all five children. Your first answer was $100, then you increased it to $150. That's $30 per child. Is that what you've given?

A.  No, I don't - - I couldn't tell you the exact amount because I go gets what they need.

THE COURT: And you haven't been able to tell us specifically, you've told us generally all these things and then you said that the State hasn't assisted nor have the caregivers given anything.

A. I said, I'm not aware of that.

THE COURT: I see, okay. Thank you.

Q. Do you want to change any of your testimony based upon any of the questions I've asked or the Judge has just asked you - - in terms of what you've done while your children have been in State's custody?

A. I can't give you a specific amount, because I can't give you a specific price. I just take care of them when the kids need anything and I go get it. So I can't give you a specific amount because I'm not sure about the amount.

Q. I don't want to put words in your mouth but what I'm hearing is that if someone asks for assistance then I try to meet that need. Is that what you're doing?

In contrast, the testimony of the DCFS caseworker, Victoria Davis, established the mother provided no significant contributions to the care and support of the children since they entered the State's custody:

Q. Okay. Do you know the extent to which [the mother] has provided for these children since they've been in State's custody?

A. The only thing that I know is when they've had birthday parties, she did buy them gifts. I don't recall the caregivers saying that she purchased any cloths [sic] or anything like that. Because I myself have met the caregivers at Wal-Mart and purchased the clothes and shoes, myself with the State's funding.

Q. Okay. That was going to be my next question. The State has not relied on the mother to provide for these children's needs?

A. No.

Q. The State has provided for these children's needs?

7

A. Correct.

Q. If the State had relied on the mother; would the children have been provided for?

A. No.

In light of the evidence demonstrating, at best, only sporadic and limited contributions, we do not find manifest error in the trial court's determination that the mother failed to provide significant contributions to the children's care and support for a period of six consecutive months. The jurisprudence has held that sporadic gift-giving does not amount to significant support. *See In re TMS*, 08-810 (La.App. 3 Cir. 11/5/08), 999 So.2d 21; *State ex rel. T.P.M.*, 06-530 (La.App. 5 Cir. 11/28/06), 947 So.2d 751; *State in the Interest of DMH v. DMH*, 27,807 (La.App. 2 Cir. 9/27/95), 661 So.2d 643.

The mother also argues "she had worked a great deal of her case plan," thus, she was not in violation of La.Ch.Code art. 1015(6). Specifically, the mother notes she "completed a drug rehabilitation program." The record does establish the mother competed an inpatient drug treatment program at Acadiana Recovery Center in March 2019. However, it was also admitted the mother did not attend any aftercare intensive outpatient treatment as instructed following her discharge from Acadiana Recovery Center. In her testimony, the mother stated she did not attend outpatient treatment because it was only offered "miles away from her home." This was contradicted by the testimony of Victoria Davis, who stated intensive outpatient treatment programs were offered at Pathways Caring Choices in Leesville, which is in reasonable proximity to where the mother lived.

Further, the record established the mother tested positive for amphetamines and methamphetamines on April 12, 2019. She then also tested positive for cocaine on May 2, 2019. Both these drug tests were after her discharge from Acadiana Recovery Center. The failed drug tests and refusal to attend intensive outpatient

treatment support the trial court's conclusion that the mother was unable to satisfy the component of her case plan to remain drug free.

The mother also asserts she satisfied the suitable housing component of her case plan by obtaining a two-bedroom, one-bath apartment. However, the testimony of Victoria Davis established on her visits to the apartment, she found other adults were living in the apartment. This was evidenced by Ms. Davis seeing other adults present during her visits. The mother stated the guests were just visitors and were not living there. However, Ms. Davis noted the beds were unmade and appeared slept in and there was adult clothing lying on the floor.

The mother's case plan also required that she attend parenting education classes. The record established she began a sixteen-week parent education program on May 7, 2019. The mother was discharged from the program on June 11, 2019, after attending six of the classes when the April 12, 2019 positive drug screen was received from Beauregard Behavioral Health. At the time of trial, it was stated the mother would have to be placed on a waiting list in order to return to parenting education classes. She also would need to have an additional substance abuse assessment and follow all treatment recommendations. Thus, the mother was unable to complete the parenting education component of her case plan due to her ongoing battle with substance abuse.

The record also reflected that the mother suffered from several mental health problems, including depression, anxiety, PTSD and panic attacks. The mother's brief also classified her as a "diagnosed schizophrenic." She stated she takes several medications to address her mental health issues. She acknowledged she did not begin mental health treatment until April, 2019, although she was released from jail in September, 2018. Although she testified she only missed one mental health visit since she began treatment, the testimony established there were numerous missed appointments in the sixty day period between April, 2019 and June, 2019. The trial

9

court found the mother was unable to show she was compliant with her mental health treatment.

The trial court also found it was not reasonable to expect significant improvement in the mother's condition or conduct in the near future considering the age of the children and their need for a safe, stable and permanent home. A review of the testimony reveals the mother refused to accept any role in her children coming into the State's custody, nor the tragic death of her one-year old child, when he was left unsupervised. The trial court, in her oral reasons, concluded as follows:

> You refuse to accept any responsibility in the fact that the children were removed from your home. The Court specifically remembers those details and finds them haunting. Haunting to this court that a mother was reportedly with her boyfriend in the house while one child was expelled from school, who started a fire on his own admission which unfortunately caused you to lose a child. And yet, after testing positive for cocaine on that date, you have refused to accept responsibility for any of your actions and refuse to continue your substance abuse recovery. For that reason, as well as the fact that your substance abuse has prevented you from completing parenting class with no possible knowledge of when that could be completed, with the additional issues of the mental health, that may or may not be in compliance. The [continual] rescheduling of appointments, which is not helpful when you are on medications that are prescribed. And the lack of preparation for having five children in your home, . . . unfortunately today for these children and for you, your parental rights are terminated.

After a thorough review of the record, it is readily apparent the mother continues to struggle with substance abuse and her own mental health problems. Her continual refusal to acknowledge these problems and her lack of compliance with her case plan reluctantly led the trial court to determine it was in the best interest of these children to terminate her parental rights. We do not find that factual conclusion to be manifestly erroneous.

**DECREE**

For the foregoing reasons assigned, the judgment of the trial court is affirmed.

**AFFIRMED.**