h COOKS, Judge.
This matter arises from a proceeding initiated by the State of Louisiana to terminate the parental rights of Sadie Washington Mitchell and Christopher Mitchell. The trial court terminated the parental rights of both parents after finding no reasonable expectation that either parent is likely to make any significant improvement in the near future, that they failed to follow the State’s case plan, and that termination of parental rights is in the best interest of the children. Both parents appeal, separately. For the following reasons, we affirm in part and reverse in part.

FACTUAL BACKGROUND

On May 1, 1997, agents from the Rap-ides Parish Child Protection Agency removed Sadie Washington Mitchell and Christopher Mitchell’s six children from their custody and control when Christopher was charged with pointing a high powered rifle at Sadie and the couple’s children. Coinciding with his arrest, Christopher was also charged with threatening Sadie and the children with violence after his release from jail. Tina LeBlanc, an investigator with the Rapides Parish Child Protection, testified she arrived at the home after Christopher was in custody and found the house cluttered, but not filthy. She also testified there was no food in the house except for infant formula. The day following their removal, the agency evaluated the six children as “failing to thrive” and placed them into foster care.
The Office of Child Safety(OCS) assigned Karen Grant to manage Sadie and *1273 Christopher’s parental rehabilitation efforts or “case plan,” which details goals set by OCS for parents to have their children returned to the home. The first case plan developed within thirty days of the children’s removal required evaluations of Sadie and Christopher by Dr. John Simo-neaux, a clinical psychologist. Christopher was directed to attend anger control management classes, and Sadie and Christopher were required to comply with a visitation contract designed to facilitate contact with their | ¡¡children while in foster care. OCS also required that no reported incidents of violence in the home were to occur, and it prohibited Sadie from carrying firearms to activities involving her children or agency staff. This latter request, as Thomasene Willett, a Social Services Supervisor with OCS testified, was required because Sadie’s agency file contained notations that she had previously either carried a weapon to OCS hearings or made threatening comments to agency officials.[1] At trial, Ms. Grant testified Sadie and Christopher complied with each of the initial case plan’s requirements.
Dr. Simoneaux evaluated Sadie and Christopher, independently on June 12, 1997. Dr. Simoneaux testified Christopher became defensive and abruptly left the interview when he attempted to discuss the family’s difficulties. Before leaving, Dr. Simoneaux noted Christopher denied the incident involving the rifle, stating he was just trying to sell it to his brother-in-law. He also denied saying anything threatening to his family when arrested and suggested the police and neighbors lied about the incident. Christopher described his relations with his wife and children to Dr. Simoneaux as normal, and said he never cursed his children, hit his wife, or argued with Sadie. He also denied having knowledge of his oldest step-daughter’s alleged sexual assault.[2]
Regarding his first evaluation of Sadie, Dr. Simoneaux testified she appeared 1¡¡very paranoid and suspicious, bordering actively psychotic, and clearly very upset with child protection becoming involved in her life. She attributed the children’s removal to a neighbor seeking retribution for her not allowing him to store drugs in their storage house. She also denied the allegations against Christopher, stating he never made threats against any family member nor was he physically abusive. Dr. Simoneaux stated she generally attempted to paint an idyllic picture of her *1274 family life. He concluded Sadie would probably benefit from a psychiatric evaluation and medication.[3]
On August 14, 1997, the couple attended a family team conference with Ms. Grant and learned of a second or revised case plan instituted by the agency, requiring the couple to attend parenting classes at St. Francis Cabrini Hospital. Sadie and Christopher attended all the scheduled parenting classes except for two, which were made-up in following sessions. On November 17, 1997, a third family team conference was held where Ms. Grant requested Sadie and Christopher schedule monthly meetings to review parenting videos and read pamphlets to re-enforce what they learned in the parenting classes. The Mitchells complied with this request as well, although Ms. Grant testified she felt the couple did not respond well to the videos because they became non-responsive when asked to explain what they learned from watching them.
On May 20th, 1998, the couple attended a fourth family team conference. At this meeting, Ms. Grapt informed Sadie not to discuss OCS’s decisions with her children during visitation, which OCS began to perceive as a problem. She also referred Sadie and Christopher to attend sessions at the Louisiana Black Alcoholic |4Counsel on a daily basis[4] and to attend another psychological evaluation with Dr. Simo-neaux.
By the May 20, 1998 conference, Ms. Grant testified Sadie and Christopher had attended parenting classes, regularly visited with their children, and had not been involved in any reported incidents of violence. However, she reported Christopher had attended, but not completed, his anger management group. With respect to the couple’s progress, Ms. Grant informed them, although they attended the parenting classes, they did not seem to have learned much from them. Ms. Grant testified she based this evaluation on conversations she had with the staff at Cabrini Hospital, but admitted she never observed the couple’s progress in class first-hand. Ms. Grant testified Sadie and Christopher became upset upon hearing this report and insisted they were doing everything the agency requested.
On June 16, 1998, Dr. Daniel LonowsH, a clinical psychologist, evaluated Sadie and Christopher at the request of OCS. He testified he received the referral because, throughout most of their initial phase and through the middle phase of their involvement with OCS, the agency characterized the two as not cooperative,[5] and were concerned that they continued to deny they had mistreated, neglected or abused their children.[6]
After his evaluation of Sadie, he concluded she demonstrated a functioning Intelligence Quotient (IQ) of less than fifty, which is far below average and indicative *1275 of mild mental retardation, although he determined she was not experiencing any form of emotional disorder. Dr. Lonowski testified Sadie presented herself to him as | sbeing rehabilitated. She did, however, admit she was not taking her medication because she was pregnant.[7] Based on the tests he administered, he concluded Sadie, “in her limited understanding of things,” was trying in someway to express the view that she was willing to admit some of her problems and willing to try to combat them. When asked whether he believed Sadie was interested and committed to trying to become a better parent, Dr. Lo-nowski responded, “to some extent I do.” However, he testified he strongly doubted Sadie had the abilities necessary for complying with the guidelines and recommendations OCS established for her to regain custody her children.
After evaluating Christopher, Dr. Lo-nowski found he continued to deny any charges of mistreatment towards Sadie and his children, and assumed no responsibility for the state’s removal of his children. Dr. Lonowski testified Christopher stated he had difficulty comprehending the parenting classes and anger management sessions because he could not read, but he felt he benefitted from talking with other members of the group. Dr. Lonowski concluded, in his opinion, he noticed no change in Christopher from a previous 1994 evaluation and doubted seriously whether OCS could recommend any services that would benefit Christopher given his rigid attitude.
In mid-July 1998, Ms. Grant informed Sadie the goals of their case plan no longer included having the children returned, but rather, the agency’s primary concern was now to have the children placed in permanent homes through adoption. Sadie testified she separated from Christopher shortly after this time because she thought the State required her to do so to have her children returned. She moved in |fiwith her brother and informed OCS of her change of address as required. Sadie continued to maintain contact with her children, although she became frustrated because the agency often faded to bring all the children to the scheduled visitation meetings pursuant to the visitation contract.
The Louisiana Department of Social Services filed a Petition for Termination of Parental Rights on September 17, 1998, pursuant to La. Children’s Code Article 1015(5). The trial court heard the matter on February 28, 24, 25, 2000, and found the state carried its required burden of proof. In its reasons for judgment, the trial court found the evidence at trial showed conclusively the problems experienced by the children; and that the alleged sexual abuse and the family violence did occur and continued to exist. The court also found the evidence showed both parents deny the existence of the problems or the need to alter their living style to any degree. Mr. Mitchell, the family member identified as the primary perpetrator, denies any substance abuse and refuses anger control efforts or parenting instructions. Mrs. Mitchell also denies Mr. Mitchell has a problem. Both parties appeal the court’s ruling.

*1276
LAW AND DISCUSSION

We premise our discussion by re-emphasizing this court’s deep respect and long recognition of a parent’s constitutionally protected liberty interest in the care, custody, and control of their children. State ex rel. J.A., 99-2905 (La.1/12/00); 752 So.2d 806; In re Adoption of B.G.S., 556 So.2d 545 (La.1990); State v. Peniston, 235 La. 579, 105 So.2d 228 (1958); In the Interest of C.L.S., 94-531 (La.App. 3 Cir. 11/2/94); 649 So.2d 532; In re Elliott, 630 So.2d 281 (La.App. 3 Cir.1993) writ denied, 94-0076 (La/3/11/94); 634 So.2d 396. The reluctance by this court to sever the parent-child relationship and derogate from the natural rights inherent therein remains strong, and we are in accord with the recent sentiment conveyed by the ^Louisiana Supreme Court:
the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration.
State ex rel. J.A., 99-2905, p. 9 (La.1/12/00); 752 So.2d 806, 811 (citing, State in the Interest of A.E., 448 So.2d 183, 185 (La.App. 4 Cir.1984)). We underscore this State’s jurisprudential convictions with those of the United States Supreme Court, which continue to affirm a parent’s interest in a child is perhaps the oldest fundamental liberty interests recognized, and the freedom to exercise this interest is among those esteemed societal rights shielded by the Fourteenth Amendment against unwarranted usurpation, disregard or disrespect by the State. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); M.L.B. v. S.L.J., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The Supreme Court in Troxel, also provided, “so long as a parent adequately cares for his or her children, (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent’s children.” Troxel, 530 U.S. at 63-64, 120 S.Ct. 2054. Accordingly, a parent has a commanding interest in the accuracy and injustice of a decision to terminate her parental rights. Lassiter v. Department of Social Svcs. of Durham County, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).
In the present case, the State brought its action to terminate the parental rights of Sadie and Christopher Mitchell under Louisiana Children’s Code Article 1015(5). The grounds for termination enumerated by this article include the following: (a) there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and, (b) there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future. La. IsCh.C. art. 1036(C) and (D) provides the petitioner may prove the lack of parental compliance with a case plan by one or more of the following:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
*1277 (4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
To warrant the termination of parental rights, the State must satisfy an onerous burden, proving each element provided as a ground for termination by clear and | ^convincing evidence. La.Ch.C. art 1035; In Interest of CLS, 94-531 (La.App. 3 Cir. 11/2/94), 649 So.2d 532. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. State in Interest of BJ, 95-1915, p. 9, (La.App. 1 Cir. 4/4/96); 672 So.2d at 347, 348, writ denied, 96-1036 (La.5/31/96); 674 So.2d 264. When fact scale is about evenly balanced in proceeding for termination of parental rights, it should be tipped in favor of parent opposing termination. State in Interest of JL, 93-352 (La.App. 3 Cir. 5/18/94), 636 So.2d 1186.
In parental termination action, trial court’s findings as to whether significant substantial indication of reformation has been shown and whether parent is likely to reform will not be set aside absent manifest error. State in Interest of S.M., 97-1896 (La.App. 4 Cir. 3/4/98), 709 So.2d 927, writ granted, 98-0922 (La.5/15/98), 719 So.2d 59, reversed on other grounds, 98-0922 (La.10/20/98), 719 So.2d 445. Recognizing the magnitude of the risks and consequences of an erroneous deprivation, appellate courts view the termination of parental rights as a severe and permanent action warranting careful scrutiny. State in the Interest of Z.D. and J.D., 95-1680 (La.App. 4 Cir. 2/15/96); 669 So.2d 1312.

Termination of Sadie Mitchell’s Parental Rights

On appeal, Sadie Mitchell argues the following assignment of errors:
1. The trial court erred in concluding that Sadie Mitchell failed to substantially comply with her case plan.
2. The trial court erred in failing to consider Sadies’ extremely limited intellectual capacity in determining the degree to which she was capable of complying with her case plan.
3. The trial court erred in continually permitting non-expert and/or heresay testimony regarding Mrs. Mitchell’s al *1278 leged continuing involvement with Mr. Mitchell and regarding the degree and/or extent of Mrs. Mitchell’s participation in the instructional sessions mandated by defendant(s).
|in4. The trial court erred in continually equating the actions and rehabilitative efforts of Sadie Washington Mitchell with those of Christopher Mitchell.
5. The trial court erred in terminating Sadie Mitchell’s parental rights to Shanbrica Washington, for the attorney for this child, in her closing argument requested that Sadie continue to have visitation of Shanbrica. This request constitutes a modification of the pleadings, and the subsequent judgment of termination vis-a-vis Sadie and Shanbri-ca therefore exceeds the relief requested.

Assignment of errors nos. 1 & 2

In support of its allegation that Sadie failed to comply with the OCS case plan, the State offered the testimony of several witnesses involved with Sadie’s rehabilitation efforts. The testimony established Sadie consistently visited with her children according to the visitation contract, completed the required parenting classes, reviewed parenting video tapes and pamphlets, regularly attended sessions to treat her mental health, submitted to the suggested psychological evaluations, and attended substance abuse sessions to support her spouse. The State did not allege Sadie was uninvolved or disinterested in parenting her children, or that she was unable to provide for their welfare by offering a stable environment. In addition, no reported incidents of violence occurred following the children’s removal from the home, and at trial it was demonstrated Sadie remained estranged from her husband, Christopher. Further, the State did not allege Sadie ever physically abused or seriously neglected her children.
The State’s presentation attempted to demonstrate Sadie simply did not benefit from the resources provided by OCS and that no possibility for future improvement exists. Sadie’s counsel argues, because of her intellectual impairment — mild retardation — she was unable to fully comprehend the material covered and was unable to meet the expectations established by the case plan. Nancy Blackwell acknowledged Sadie suffers from a “lack of comprehending the topics that we were |1T discussing.” Ms. Blackwell agreed the intellectual level of the course seemed to be above Sadie’s intellectual capacity. Dr. Lonowski also testified:
I began, during the interview, began to be concerned about her ability to express herself and to understand the pattern of questioning and some to the words I was using. These were consistent with previous observation of her as having quite limited intellectual ability in the range of mild mental retardation.
When questioned on her ability to acquire the information to understand the classes required by her case plan, Dr. Lonowski testified, “Mrs. Mitchell would have difficulty simulating, acquiring, the information at a high enough level to consider it successful. Unless it was tailored, modified to more of the individual’s educational effort.” Counsel argues because Sadie received no parenting instruction to fit her special needs, OCS formed an erroneous perception regarding her dedication to the rehabilitation efforts and her degree of her progress. Although Sadie’s mental deficiencies clearly interfered with her ability to benefit from the resources provided by OCS, the State failed to demonstrate this deficiency would interfere with her ability to parent her children.
With respect to Sadie’s potential to improve, Dr. Simoneaux (testifying for the State) suggested he believes Sadie’s future *1279 improvement depends on, “her willingness and conviction about continuing whatever medication regiment is necessary.” At trial, Sadie stated once it was explained to her what the medication was, she began taking the prescribed medication regularly. Dr. Alla, Sadie’s treating psychiatrist, testified she had no reason to suspect Sadie was not taking the medications prescribed to her given the recognized improvement in her condition; and she even suggested at some point a continual medication regime for Sadie may prove unnecessary.
It is clear to this court that Sadie Mitchell has made every effort to comply with the rehabilitation protocol demanded by the State, and she has demonstrated improvement and possesses the potential to improve further in the future. If not for h ¡.her association with Christopher Mitchell, her estranged husband, the events leading to her children’s removal would most certainly have been avoided. The record does not in any way indicate Sadie Mitchell poses a threat to her children or to OCS employees, as suggested by the trial court. The weight of the evidence offered by the State fails to prove the allegations set forth in its petition, unless we equate the actions and rehabilitative efforts of Sadie with those of her husband Christopher. We, therefore, do not hesitate to find the trial court’s judgment was manifestly erroneous in terminating the parental rights of Sadie Mitchell.

Termination of Christopher Mitchell’s Parental Rights

In its reasons for judgment, the trial court identified Christopher Mitchell as the primary perpetrator of the family’s problems. The testimony offered by the State suggests the violent episode resulting in the children’s removal was characteristic of the relationship Christopher maintained with his family. From his evaluations of S.N.W and C.L.M., Dr. Si-moneaux testified Christopher was extremely aggressive towards his wife and children and related several accounts of extreme violence in the home. One such incident involved Christopher hitting his wife with a stick and punching her in the face while the children were present, and he threatened S.N.W for attempting to call the police to intervene. Dr. Simoneaux also testified Christopher expressed to his children his desire to shoot the police with the several weapons he kept in the house.
The case plan developed by OCS required Christopher attend anger management sessions. Karen Grant testified Christopher completed less than half of the anger management modules in a years time and stated the class usually is completed in three to six months. Although he eventually attended 19 sessions, Christopher expressed to Dr. Simoneaux and others involved with his rehabilitation that the classes had nothing to offer and were unnecessary because he did not have |13a problem with his anger.
Dr. Simoneaux testified Christopher blatantly denied having any problem whatsoever and his attitude toward the rehabilitation efforts was that he did not need the information or counseling because nothing was wrong. Through the course of following the case plan, Christopher displayed an extremely superficial understanding of the problems in his family. Dr. Simoneaux concluded Christopher had made no progress towards improvement, and both Drs. Simoneaux and Lo-nowski testified they doubted seriously whether OCS could recommend any services that would ever benefit Christopher given his rigid attitude and consistent denials concerning the evident problems.
Unlike the significant testimony of Sadie Mitchell’s redeeming qualities and her po *1280 tential for improvement, we find no reasonable expectation of reformation exists for Christopher Mitchell. We affirm the trial court’s judgment terminating the parental rights of Christopher Mitchell.
DECREE
For the foregoing reasons, that portion of the trial court’s judgment terminating the parental rights Christopher Mitchell is affirmed. That portion of the judgment terminating the parental rights of Sadie Mitchell is reversed.
REVERSED IN PART, AFFIRMED IN PART.
AMY, J. dissents and would affirm the judgment of the trial court in full.
SULLIVAN, J. dissents and would affirm the judgment in full.

. The court allowed testimony concerning the existence of this notation in Sadie's file, but Ms. Willett did not know the exact nature of the alleged incident, which occurred prior to 1997. Sadie Mitchell’s counsel objected to this testimony as irrelevant and outside the scope of the present proceedings.

. The incident and after-math of S.N.W.’s alleged sexual assault is tenuous in the record at best. Sadie testified S.N.W. first reported the alleged incident to her when she was twelve. Sadie testified S.N.W. reported it was Christopher's brother-in-law, Lionel, who abused her. Sadie and Christopher alleged they reported the incident to the police, but when the police went to arrest Lionel, he was not home and Lionel's mother informed the police that Christopher committed the abuse. Further, Sadie explained Lionel threatened S.N.W. so she would change her story and state it was Christopher who abused her instead of himself. Sadie stated that following the alleged incident, she handled it by keeping S.N.W. away from Lionel. She testified she did not think it would happen again.
S.N.W. testified Christopher Mitchell, her step-father, was the perpetrator of the incident. S.N.W. testified both her and her mother tried to inform authorities but were afraid Christopher would hurt them because he had previously threatened to do so. Sadie denied she ever thought Christopher assaulted S.N.W. and testified S.N.W. only changed her story after Lionel threatened to kill her. The record contains no evidence that formal charges were filed against either Lionel or Christopher for the alleged incident, or that a formal investigation into the matter ever resulted.

. OCS referred Sadie to Dr. Lalitha Alla, M.D., a board certified psychiatrist, who was continuing her treatment of Sadie at the time this matter was brought to trial and testified on her behalf.

. The record does not indicate either Sadie or Christopher suffered from problems related to persistent substance abuse. Nancy Blackwell, executive director of the Council, acknowledged Sadie and Christopher attended some of the sessions, but she testified they did not participate often and deemed Sadie did not comprehend the topics discussed. Sadie Mitchell’s attendance was strictly to support her spouse.

. The record contains no other reference which suggests the Mitchells were uncooperative with OCS in their requests for compliance to their case plans, or in any other manner.

. The record contains no reference to allegations Sadie Mitchell ever physically abused or grossly mistreated her children.

. At trial, Sadie testified she lied about being pregnant as an excuse for not taking the medication prescribed by her psychiatrist. She stated she did so because “they didn't explain to me the reason why I was taking them,” and, "my mother always told me, not to take nothing that you do not know what you're taking because you can be taking any kind of drugs.” She testified once it was explained to her what the medication was, she began taking the prescribed medication regularly and continued to do so at the time of trial, which was not refuted.