800 So.2d 809 (2001)
STATE of Louisiana in the Interest of SNW, CJW, CLM, CNM, JAM & IMM
v.
Sadie W. MITCHELL and Christopher L. Mitchell, Sr.
No. 2001-CJ-2128.
Supreme Court of Louisiana.
November 28, 2001.
*810 Joseph R. Kutch, Pineville, Counsel for Applicant.
David D. Lind, Edward A. Kaplan, Alexandria, Counsel for Respondent.
LOBRANO, Justice Pro Tempore.[*]
This is an involuntary termination of parental rights proceeding. Based on La. Ch.C. art. 1015(5), the trial court terminated Sadie Mitchell's parental rights to her six minor children, SNW, CJW, CLM, *811 CNM, JAM, and IMM.[1] Finding that decision manifestly erroneous, the court of appeal reversed.[2] On the state's application, we granted certiorari to address the correctness of that decision.[3] Concluding that the state satisfied its burden of proof under Article 1015(5), we reverse the court of appeal and reinstate the decision of the trial court terminating Sadie Mitchell's parental rights.

FACTS
On May 1, 1997, the Alexandria Police Department contacted the state Office of Community Services ("OCS") in response to an incident of violence at the Mitchell's home. On that date, Christopher Mitchell, Sr., allegedly pointed a high powered, loaded rifle at his wife, Sadie, and her children. In addition, he allegedly threatened to "finish them off" when he was released from jail.
Following Christopher's arrest, an OCS investigator visited the Mitchell's home. The investigator described the home as cluttered, but not filthy, and stressed that the sole food found in the home was some infant formula. Based on the belief that the children were in danger, an instanter order of custody was obtained for their emergency removal. La. Ch.C. art. 619. The next day the children were medically examined; almost all of them were labeled as "failing to thrive." In August 1997, all six children were adjudicated as children in need of care under La. Ch.C. art. 606. The children were placed in foster care and remained there at the time of trial.[4]
As the trial court notes in its reasons for judgment, the following additional family problems were discovered after the children were removed:
[SNW] disclosed that she and a sister had been sexually abused by a family member and that all members of the family were subjected to extreme levels of violence....[CLM] was diagnosed as suffering from a reactive attachment disorder that could be attributed to the failure of the care givers. Sadie Mitchell was diagnosed as suffering from a mental illness and exhibiting signs of paranoia at the time of removal and intermittently thereafter. Mrs. Mitchell was found to be experiencing chronic delusions as well.
Within thirty days after the children's removal, OCS formulated an initial case plan for Sadie. La.Ch.C. art. 673.[5] At that point, OCS's goal was reunification. To accomplish that goal, the plan required that Sadie do the following: (i) undergo psychological evaluations; (ii) maintain bimonthly *812 contact with her OCS case manager, Karen Grant; (iii) comply with the visitation contract designed to facilitate contact with the children during their separation; (iv) forgo all reported acts of violence in the home;[6] and (v) resist carrying weapons to OCS activities.[7]
In June 1997, Dr. John Simoneaux, a clinical counseling psychologist, evaluated Sadie. Dr. Simoneaux testified that during the evaluation Sadie appeared very paranoid and delusional, bordering actively psychotic. He further testified that she denied the allegations that Christopher was violently abusive and threatening to the family and painted an "idyllic" picture of her family life. Dr. Simoneaux concluded that she appeared mentally ill, but probably would benefit from psychiatric evaluation and medication.[8]
In August 1997, a family team conference was held at which OCS revised the case plan to add a requirement that Sadie attend parenting classes offered by St. Francis Cabrini Hospital. These classes were educational in nature and designed to inform parents about rearing adolescents and young children. Although Sadie attended all the classes, Ms. Grant opined that Sadie did not grasp much from the classes. Ms. Grant, however, based her opinion on conversations with Cabrini staff; she never personally observed Sadie's progress (or lack thereof).
In November 1997, a second family team conference was held at which OCS revised the case plan to require that Sadie attend: (i) individual counseling sessions with her case manager, Ms. Grant, to review parenting videos and pamphlets; (ii) women's group and family counseling sessions at Exodus;[9] and (iii) psychological evaluations at Alexandria Mental Health Center ("Mental Health").
Despite Sadie's compliance with these requirements, OCS claimed that she still had made no substantial progress. Opining that the individual sessions were not beneficial, Ms. Grant cited one occasion on which Sadie became non-responsive when asked to engage in dialogue about the contents of the video she had watched. Similarly, the executive director for the service provider at Exodus testified that Sadie attended some sessions, but was discharged after a few months due to her failure to comprehend the topics being discussed and her disruptive, off topic responses in group discussions. More particularly, the executive director's report states that "[i]t is evident that client's [Sadie's] *813 understanding is far below average. On 9/31/98 client was discharged reason being no progress."
In June 1998, based on Dr. Simoneaux's recommendation that she would probably benefit from psychiatric evaluation and medication, Sadie began treatment with Dr. Lalitha Alla, a psychiatrist at Mental Health. Dr. Alla diagnosed Sadie as delusional and, by mid 1999, prescribed the medication Haldol. Initially, Sadie refused to take the medication and lied about being pregnant as an excuse for not taking it. Once it was explained to her what the medication was for, she began taking it and was still taking it at the time of trial. When Dr. Alla last saw Sadie in December 1999, she observed that Sadie was more cooperative and had benefitted from the medication. Dr. Alla suggested that if Sadie was not under stress, she may not need the medication.
In April 1998, less than one year after the removal of the children, OCS changed its goal from reunification to termination given that Sadie had shown neither substantial compliance with the case plan, nor significant improvement. This decision, however, was not communicated to Sadie until July 1998, when Ms. Grant formally informed her of this change.
In the interim, in May 1998, a third family team conference was held at which OCS once again revised the case plan. The revised plan required Sadie: (i) to provide the children with a safe and secure home, (ii) to demonstrate positive parenting skills with her children, (iii) to actively participate in all scheduled parenting class sessions, (iv) to refrain from discussing OCS decisions with the children,[10] and (v) to attend a psychological evaluation.
In June 1998, Dr. Daniel Lonowski, a clinical psychologist, evaluated Sadie and concluded that she has a very limited intellectual ability. He opined that she was functioning in the mild range of mental retardation but was not experiencing any emotional disorder. Although Dr. Lonowski acknowledged that change in the future was not likely to occur, he recognized that because of her intellectual deficiency compliance with the OCS case plan was questionable. Specifically, Dr. Lonowki testified that "Mrs. Mitchell would have difficulty simulating, acquiring, the information at a high enough level to consider it successful. Unless it was tailored, modified to more of the individual's educational effort."
In November 1998, another family team conference and a permanent placement hearing were held.[11] OCS's goal at that point remained to be termination based on Sadie's continued lack of progress. The trial judge approved that case plan in December 1998. One of the requirements of that case plan was that Sadie attend sessions at Mental Health and take all prescribed medications.

*814 TERMINATION PROCEEDING
In September 1998, sixteen months after the children were removed, OCS filed its petition to terminate Sadie's parental rights based on La. Ch.C. art. 1015(5), which sets forth the following three-pronged requirement:
[i] Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; [ii] there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and [iii] despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
Following several continuances, in February 2000, the termination proceeding was tried. The trial court found that the state carried its burden of establishing by clear and convincing evidence that: (a) Sadie failed to comply with the court-approved case plan, (b) that there was no "reasonable expectation" that she "is likely to make any significant improvement in the near future," and (c) that it was in the children's best interest to terminate Sadie's parental rights.
Reversing based on manifest error, the court of appeal cited the following reasons: (i) Sadie "made every effort to comply with the rehabilitation protocol demanded by the state;" (ii) she "demonstrated improvement and possesses the potential to improve further in the future;"[12] (iii) she poses a threat to neither her children, nor to OCS employees; and (iv) but for her association with "her estranged husband, the events leading to the children's removal would most certainly have been avoided." 00-1744 at pp. 11-12 (La.App. 3d Cir.6/20/01), 788 So.2d 1271, 1279.
Before this court, neither side disputes Sadie's effort to comply with OCS's protocol as set forth in the court-approved case plan. Instead, the dispute centers on two other issues. First, the parties dispute whether the trial court's factual finding that the state proved Sadie failed to substantially improve or would likely improve in the near future was manifestly erroneous. Second, the parties dispute whether OCS was required not only to recognize Sadie's mental deficiency, but also to tailor the case plan to meet her particular needs. Before addressing those specific issues, we briefly review the recent policy changes regarding termination proceedings in general.

ANALYSIS
A well-settled principle is that the "the fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982). Reiterating this principle, the Supreme Court recently remarked that this liberty interest is "perhaps the oldest of the fundamental liberty interests." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000). A corollary principle is that *815 in an involuntarily termination of parental rights proceeding, a court must delicately balance the natural parent's fundamental right and the child's right to a permanent home.
In 1997, Congress passed the Adoption and Safe Families Act (ASFA), 42 U.S.C. § 601, et seq. The ASFA tilts this delicate balance in the child's favor and requires states, as a condition to continued receipt of certain federal funding, to enact parallel legislation. Simply stated, ASFA is intended to make four principal reforms; to wit:
[1] that the safety of children is paramount in custody decision making; [2] that foster care is temporary and that agency and judicial decision making must be expedited in order to optimize the child's needs for a stable and permanent home; [3] that the state's duty to make "reasonable efforts" to reunify a family is subordinate to legitimate concerns about the child's health and safety; and [4] that states will be held accountable for their efforts to reduce the number of children who are stranded in the foster care system.
La. Ch.C. art. 601, Official Cmt. (b)(emphasis supplied).
Complying with the ASFA, the Louisiana Legislature amended several of the termination provisions including La. Ch.C. art. 601, which was amended to declare that "[t]he health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title." See La. Ch.C. art. 601, Official Cmt. (c) (noting that "the child's health and safety is the paramount concern in determining what is reasonable and consistent with the department's plan for timely, permanent placement of a child."). Under certain egregious circumstances (not present here), the state is entirely excused by La. Ch.C. art. 672.1 from making any reasonable efforts to reunify.[13]
That the balance is tilted in the child's favor is further evidenced by La. Ch.C. art. 702 E, which provides:
Except as otherwise provided in La. Ch.C. art. 672.1 [which excuses the state in certain cases from exercising reasonable efforts], the court shall determine whether the department has made reasonable efforts to reunify the parent and child.... The child's health and safety shall be the paramount concern in the court's determination of the permanent plan.
And, La. Ch.C. art. 702 D(1) places the burden on the parent seeking to avoid termination when the child has been in foster care for over twelve months; particularly, it provides:
In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress towards achieving its goals and correcting the conditions requiring the child to be in care. (Emphasis supplied).
Consistent with this federally-prompted shift in policy, our recent decisions have recognized that "the primary concern of the courts and the state remains to secure the best interest for the child, including termination of parental rights if justifiable statutory grounds exist and are proven." State in the Interest of S.M.W., C.D.W., C.N.W. and E.S.W., 00-3277 at p. 21 (La.2/21/01), 781 So.2d 1223, 1238.
*816 Seven statutory grounds for involuntary termination of parental rights are set forth in La. Ch.C. art. 1015. Only one ground need be established; however, the trial judge must also find that termination is in the child's best interest. La. Ch.C. arts. 1015, 1039; State in the Interest of ML and PL, 95-0045 at p. 4 (La.9/5/95), 660 So.2d 830, 832. Given the draconian nature of an involuntary termination proceeding, the state is required to prove the statutory ground on which it relies by clear and convincing evidence. La. Ch.C. art. 1035(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)(holding clear and convincing to be minimum standard of proof in termination cases). A trial judge's findings on factually-intense termination issues are governed by the manifest error standard of review. State in the Interest of S.M.W., 00-3277 at p. 14, 781 So.2d at 1233.
With that general policy background in mind, we turn to the specific issues in this case.

TERMINATION UNDER ARTICLE 1015(5)
The specific statutory ground on which the state relies in this case is La. Ch.C. art. 1015(5), quoted above, which sets forth a three-pronged requirement for termination.[14] The first prong simply requires the lapse of a year and is not disputed. Rather, the dispute is over the second pronglack of substantial parental compliance with a court-approved case planand the third pronglack of a reasonable expectation of significant improvement in the near future.
The substantive elements proving lack of substantial parental compliance with a court-approved case plan are enumerated in La. Ch.C. art. 1036(C), which provides that this prong may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification. (Emphasis supplied).
See La. Ch.C. art. 1036, Official Cmt. c (noting this is a relatively new provision that was meant to clarify vague terms such *817 as "no significant, substantial indication of reformation.").
Likewise, the substantive elements proving lack of a reasonable expectation of significant improvement in the near future are enumerated in La. Ch.C. art. 1036(D), which provides that this prong may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
As noted, the specific issue is whether the trial court was manifestly erroneous in finding that the state proved that Sadie failed to substantially improve or would likely improve in the near future by clear and convincing evidence. See La. Ch.C. art. 1036(C)(6). OCS's position is that Sadie simply walked through the motions and was simply physically, passively present at the various services provided. As a result, OCS argues that she made no substantial gains from the services in terms of improving her parenting skills that led to removal of the children. In support of that position, OCS observed that the service providers reported Sadie's failure to progress.
Agreeing, the trial court found the state carried its burden of proving that Sadie failed to make substantial progress and that she was unlikely to improve in the near future. Based on our thorough review of the record, we conclude that the court of appeal erred in finding that conclusion manifestly erroneous. The record completely supports the trial court's factual finding. Illustrative, Dr. Simoneaux testified that he evaluated Sadie for a second time in July 1999. At that time, she apparently was taking her medication because she was more "organized" and "together" than before. Nonetheless, he testified that she was still delusional, that her demeanor changes for the worst when in stressful situations, and that she "was not making significant progress to reward placing the children back in the home."
Accordingly, we conclude that the state carried its burden of proving the three prong requirements for termination under La. Ch.C. art. 1015(5) by clear and convincing evidence. Nonetheless, we address the sub-issue raised of whether in light of Sadie's mental deficiency the state had a duty to tailor the case plan to meet her particular needs.

STATE'S DUTY TO TAILOR A PLAN
We interpret Sadie's argument to be that, even assuming the state proved she failed to make substantial improvement, termination is still not warranted because the state had a duty to tailor the case plan to her capabilities and failed to do so. The state replies that this argument attacking the reasonableness of the case plan comes too late. Apparently, the state's reply is premised on the statutory provisions requiring court approval of case plans as reasonable and foreseeable and permitting the parties to appeal such court approval *818 when the plans are considered unreasonable.
Explaining the requirement that the case plan be approved, the official comment to Article 1036(C), states that "[La. Ch.C. art. 1015(5) ] now requires prior court approval of the reasonableness and feasibility of any case plan for services proposed by the department in an effort to achieve parental reformation and family reunification." La. Ch.C. art. 1036, Official Cmt. c. The comment also cross-references La. Ch. C. arts. 687-700, which set forth the requirements for submission and approval of an adequate case plan. Id. Finally, the comment cautions that "in order to demonstrate lack of compliance with the conditions of a case plan as justification for the termination of parental rights [pursuant to La. Ch. C. art. 1015(5) ], the department must have secured prior judicial approval of its plan." Id. The latter point is expressly stated in La. Ch.C. art. 700, which also provides a right to appeal in Section B.[15]
These statutory provisions thus shift the onus from OCS to the party directly affected by the case plan-a parent in Sadie's position-to object if that party deems the plan to be unreasonable or the plan fails to meet that party's particular needs. Moreover, if the trial court nonetheless approves the plan, that party is expressly given the right to appeal. La. Ch.C. art. 700 B; see also La. Ch.C. art. 710 C (providing right to appeal permanent placement plan).
In this case, the trial court as early as December 1998 approved a case plan calling for termination. At that point, Sadie could have objected, appealed, or both, if she was dissatisfied with the case plan. She failed to do so. The trial court's decision to terminate her parental rights based on her failure to make substantial progress under that plan cannot now be collaterally attacked on the basis that the plan was not tailored to meet Sadie's particular needs. Furthermore, the record supports the conclusion that Sadie never expressed dissatisfaction with any of the other case plans, nor considered them unreasonable until the actual trial and appeal of her case. In fact, the evidence shows that Sadie's attitude towards the plans was one of total disinterest.
More important, however, the record reflects that the chances were minimal that even a tailored plan would have made a difference. Even though on cross examination Dr. Lonowski admitted there was a possibility that Sadie could not live up to the guidelines in the OCS case plan, the possibility that a tailored plan would help her was very slight.
*819 Hence, we hold that the court of appeal was in error in reversing the trial court's termination judgment as to Sadie. There was no manifest error as to that court's ruling. Furthermore, although we have no disagreement with the argument that the state should tailor a case plan to meet the particular needs and capabilities of a mentally disabled parent, that parent should make his or her dissatisfaction known before the case is brought to trial. Sadie failed to do so.

DECREE
For the foregoing reasons, we reverse the judgment of the court of appeal and reinstate the judgment of the district court terminating the parental rights of Sadie Mitchell.
REVERSED.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] The birth certificates of SNW and CJW state that their father is unknown; the birth certificates of CLM, CNM, JAM, and IMM state that their biological father is Christopher Mitchell, Sr. At this time, the children range in age from four to seventeen years old.
[2] 01-1744(La.App. 3d Cir.6/20/01), 788 So.2d 1271. The court of appeal affirmed the trial court's termination of Christopher's parental rights. See footnote one. Given that Christopher did not apply for certiorari, the judgment terminating his parental rights is final.
[3] 01-2128 (La.8/29/01), 795 So.2d 345.
[4] The state points out that this family has been the subject of prior removal proceedings.
[5] As discussed elsewhere, the record reflects that OCS complied with the various statutory requirements of promptly compiling a case plan, holding regular case plan reviews, and annual permanent placement hearings; these case plans were reviewed and approved by the district court, as statutorily required. See La. Ch.C. arts. 677 (case plan review), 700 (case review hearing); 710 (permanent placement plan). The significance of these requirements is that a court-approved case plan is a prerequisite to reliance on La. Ch.C. art. 1015(5) as a grounds for termination.
[6] No evidence in the record indicates that Sadie was responsible for any violence in the home; the allegations of violence in the home were all directed at Christopher. Indeed, in an apparent attempt to have the children returned, Sadie reported to OCS in September 1999 that she had separated from Christopher and that she was living with her brother. The trial court, however, factually found Sadie "still continue[d] her relationship with him."
[7] Both Karen Grant, the initial case manager, and Thomasene Willett, an OCS supervisor, testified that the reason for this requirement prohibiting both Sadie and Christopher from carrying firearms to agency activities was a pre-1997 report that Sadie had either carried a weapon to OCS hearings or made threatening comments to agency officials. Sadie's attorney objected to Ms. Willett's testimony regarding this issue given Ms. Willett did not observe these incidents and only a notation of the incidents was located in Sadie's files. The court, however, allowed the testimony because of the file notation.
[8] As noted elsewhere, as a result of that recommendation, Sadie was referred to a psychiatrist, Dr. Lalitha Alla, who prescribed medication.
[9] The name of the facility where the women's group and family counseling sessions were held is Exodus; the Louisiana Black Alcoholism Council is the name of the service provider there.
[10] As to this requirement, Ms. Grant testified that Sadie "appeared" to discuss OCS decisions with the children during visitation, but conceded that she did not hear what Sadie discussed with them. Rather, Ms. Grant testified that this was based on observing their actions during visitation, which suggested that Sadie was doing so.

As to visitation in general, Thomas Gibbs, who replaced Ms. Grant as Sadie's case manager in June 1999, testified that Sadie continued to visit the children pursuant to the case plan schedule. Gibbs noted, however, that Sadie became frustrated when OCS failed to comply with the visitation contract requirement that they bring all the children to the scheduled visitations.
[11] Pursuant to La. Ch.C. art. 702 B, permanency hearings are required to be held annually. In this case, another such hearing was held in November 1999. And, the termination proceeding was tried in February 2000.
[12] With respect to Sadie's potential to improve, the court of appeal pointed to the fact that all of the experts agreed her future improvement depended on her willingness to take the prescribed medication. Her current treating psychiatrist, Dr. Alla, opined there was no reason to suspect she was not taking her medication or will stop taking it unless permitted to do so.
[13] The term "reasonable efforts" is defined to mean "the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families." La. Ch.C. art. 603(17).
[14] This provision is "a combination of source Articles 1015(4) and (5) which were inconsistent, though each purported to govern situations in which a child had been removed by court order from the parent's custody and reasonable department efforts had failed to achieve parental reformation and to reunify the family." La. Ch.C. art. 1015, Official Cmt. e. Prior La. Ch.C. art. 1015(5)(c) required that "[t]he department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child." Repealing that provision, the Legislature replaced it with the requirement that "despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home." La. Ch.C. art. 1015(5).
[15] La. Ch.C. art. 700 provides:

A. At the conclusion of the case review hearing, the court may:
(1) Approve the plan as consistent with the health and safety of the child and order compliance by all parties. The court shall inform the parents that:
(a) It is their obligation to cooperate with the department, comply with the requirements of the case plan, including their duty ... to correct the conditions requiring the child to be in care.
(b) A termination of parental rights petition may be filed based on their failure to comply with the case plan, failure to make significant measurable progress toward achieving case plan goals and to correct the conditions requiring the child to be in care, or any other ground authorized by Article 1015.
(2) Find that the case plan is not appropriate, in whole or in part, based on the evidence presented at the contradictory hearing and order the department to revise the case plan accordingly;
B. Any person directly affected may appeal the findings or orders of the court rendered pursuant to this Article.
See also La. Ch.C. arts. 677 (case plan review) and 710 (permanent placement plan).