KUHN, J.
|2The Department of Social Services, Office of Community Services (OCS) filed a petition to terminate the parental rights of the mother and father of the minor child, DM.[1] The trial court rendered a judgment, which terminated the mother’s parental rights but dismissed the petition for termination of the father’s parental rights. The mother and OCS appeal. We affirm in part, reverse in part, and render.
FACTUAL AND PROCEDURAL BACKGROUND
The child, the mother’s third daughter, was born in May 1998 as a result of an out-of-marriage union with the father. In June 2000, July 2001, and February 2003, OCS intervened in the mother’s custody, and the child was temporarily removed from the mother’s home due to allegations that she physically abused the child. The child was placed in the care of her maternal great-grandmother.
The whereabouts of the father were unknown in June 2000. When the child was born, the father had recently been released from prison after serving a four-year sentence for indecent behavior with a minor. He was involved in the child’s life only sporadically and was imprisoned again in September 2000 after having been convicted of contributing to the delinquency of a minor and an offense involving a minor. He was released from prison in January 2003, and in March, he contacted the child at her great-grandmother’s house. Due to a parole restriction, he was unable to provide a place of residence for the child.
OCS filed a petition for termination of the parental rights of both parents in September 2004. After a five-day trial on the merits, the trial court ordered | stermination of the mother’s parental rights based on a finding that the mother had physically abused and medically neglected the child. The trial court refused to terminate the father’s parental rights, concluding that OCS failed to include the father in the requisite proceedings. Thus, the trial court reasoned the ground upon which termination was sought was imped *627 ed by omissions attributable to OCS. A judgment in conformity with the trial court’s determinations was signed on May 20, 2005.
In her appeal, the mother urges that OCS failed to meet its burden of proof. She also contends that the trial court failed to consider the best interest of the child or to properly weigh testimony suggesting that she has reformed. In its appeal, OCS complains that the trial court incorrectly dismissed the petition seeking termination of the father’s rights.
LAW
The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents. State ex rel. SNW v. Mitchell, 2001-2128, p. 8 (La.11/28/01), 800 So.2d 809, 814 (quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982)). A corollary principle is that in an involuntarily termination of parental rights proceeding, a court must delicately balance the natural parent’s fundamental right and the child’s right to a permanent home. Mitchell, 2001-2128 at p. 8, 800 So.2d at 814-15.
Seven statutory grounds for the involuntary termination of parental rights are set forth in La. Ch.C. art. 1015. Only one ground need be established; however, the trial court must also find that termination is in the child’s best interest. La. Ch.C. Rarts. 1015, 1039; Mitchell, 2001-2128 at p. 10, 800 So.2d at 816. Given the draconian nature of an involuntary termination proceeding, OCS is required to prove the statutory ground on which it relies by clear and convincing evidence. La. Ch.C. art. 1035 A; Mitchell, 2001-2128 at p. 10, 800 So.2d at 816. A trial court’s findings on factually-intense termination issues are governed by the manifest error standard of review. Mitchell, 2001-2128 at p. 10, 800 So.2d at 816.
TERMINATION OP THE MOTHER’S PARENTAL RIGHTS
Tjie ground upon which the trial court predicated termination of the mother’s parental rights is set forth in La. Ch.C. art. 1015(3)(i), which states in part:
Misconduct of the parent toward this child or any other child of the parent or any other child in his household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit ... [a]buse or neglect which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.
The record establishes that in June 2000, the two-year old, who had been living with her mother and the child’s two sisters, was found with severe bruises on her buttocks, the inside of her thighs, and on her vaginal area. Bruises on her lower extremities and chest as well as thermal burns were also present on the child.
Earl K. Long pediatrician Dr. Bryan Despinasse, II, who treated the child in June 2000, concluded that the child had been physically abused, having received the injuries as a result of non-accidental trauma. He testified that the mother admitted that she had administered corporal punishment with a belt because the child had defecated on herself, and had explained that the thermal burns had been a result of the child sitting in a tub of hot water. Dr. Despinasse determined that the child had | Joeen subjected to emotional maltreatment since the mother had stated that she whipped the child because the *628 child did not want to potty train. Dr. Despinasse explained that the child was not developmentally able to potty train and so the beating for something she could not possibly do amounted to emotional maltreatment. He also opined that the child had been medically neglected based on the presence of a four-centimeter laceration under the child’s chin that should have been sutured but for which no medical treatment had been sought.
As a result of this intervention, the mother was provided parenting education and therapy, the child was placed in protective daycare, and OCS monitored the family. In August 2000, after the child defecated on herself with diarrhea, the mother called OCS and requested that the child be removed from the home. The child was placed in the custody of OCS, where she remained until May 2001, when a court ordered her returned to her mother’s custody with three-month OCS supervision.
In July 2001, the child was again removed from the mother’s custody after OCS received a report of marks and bruises on the child’s body. The child reported that she had been handcuffed after she had wet on herself.
The child was examined by another pediatrician at Earl K. Long Pediatric Clinic, Dr. Charmaine Venters, who found deep abrasions around both ankles. Additionally, she testified that the child suffered from bruises around her ankles and wrists, healed scars, superficial marks, and superficial belt marks on her thighs and buttocks. Dr. Venters also noted the child was missing a tooth, which was developmentally unusual for a three-year old.
1 (¡Dr. Venters concluded that the child had suffered non-accidental trauma, explaining that the marks were consistent with a rope, belt, or handcuffs having been tied around the ankles and wrists. She testified that some of the marks on the child’s body were administered by a belt, describing how the entire belt impression was evident from the child’s body. According to Dr. Venters, the marks and bruises on the child’s body were not as a result of normal activity for a three-year-old child. She concluded that the child was at risk of further physical abuse in the mother’s custody.
Although OCS requested custody of the child after the July 2001 incident, it was denied. In September 2001, the mother and OCS reached an agreement allowing custody to continue with the mother supervised by OCS. Additional protective orders required the child be placed in Head Start at Southern University. The mother was to inform the school of any reason for the child’s absence and, in the event the child missed more than two days, the mother was required to present with a doctor’s excuse. One-weekend monthly visitation with the child’s great-grandmother was ordered. The trial court also ordered the mother to maintain monthly contact with OCS and to attend individual counseling. The family, including the great-grandmother, the mother’s boyfriend, and the child’s two siblings, was required to submit to evaluations by the LSU Family Assessment Team. This arrangement remained in effect until March 2002, when OCS’s supervision ended in accordance with the terms of the agreement.
In February 2003, the child, who was then four years old, was brought by a family member to the emergency room at Earl K. Long with a bruised, black eye, a swollen stomach, and multiple bruises and marks over her body. The child’s body _[¿was swollen and full of scars, both healed and unhealed, which appeared to have been belt marks.
*629 According to Earl K. Long pediatrician Dr. Michael Christner, the child advised him that she had been whipped for stealing peanut butter and bread from the kitchen at her mother’s home. The child also stated that she had been hit in the eye with a belt for having consumed Dimetapp medicine, explaining that she had been hungry and wanted something to eat. Apparently, no medical treatment had been sought for the child at the time it was discovered she had consumed the medicine. Dr. Christner found the child’s injuries to be consistent with her explanation and concluded it was not safe for the child to return to the mother’s home. Concerned about the child’s protuberant belly, which he indicated was not fat, and having noted an enlarged liver, Dr. Christner recommended additional medical treatment, opining that the child was suffering from mid-mild, chronic malnutrition.
The child was subsequently treated at the Children at Risk Evaluation (CARE) Center at Children’s Hospital. A review of the child’s Earl K. Long medical record indicated that the child had advised that on occasion she slept on the bathroom floor because the mother did not trust'the child to abstain from eating food in the middle of the night; the mother whipped her and turned hot water on in her shower; the mother had kicked the child into a wall when the child had not vacuumed correctly; the child slept in a cupboard; and the child stayed in a closet until the other children returned to the house.
CARE Center Medical Director and supervising physician, Dr. Scott Anthony Benton, testified that the pattern-shaped scars on the child’s body were inflicted trauma, i.e., neither accidental nor self-inflicted. Dr. Benton stated that CARE IsCenter’s physical findings were consistent with the child’s explanation of how she had received many of the injuries. The CARE Center concluded that there was definitive physical abuse and found that the child’s explanation was indicative of neglect. Viewing photos he had taken of the child upon her arrival to the CARE Center, Dr. Benton stated that five days after her initial hospitalization at Earl K. Long, the child still was clearly not normal and warranted immediate medical attention. That her mother did not seek medical attention to address the child’s obvious abnormal physical condition constituted medical neglect in Dr. Benton’s opinion. If the child were returned to the mother, there was a high risk for further abuse according to the CARE Center Medical Director and, thus, it was recommended that the child be protected by placing her in a safe environment.
Dr. Benton reviewed the child’s medical history and agreed with the medical opinions of Drs. Despinasse, Venters, and Christner that the child had been physically abused. Dr. Benton explained that the mother, who had been provided extensive services, including, individual and parental counseling by the time of the July 2001 incident,,was administering physical abuse as a result of premeditated motives rather than reacting .from an impulsive control disorder. The escalation of physical abuse by the -mother subsequent to her participation in services specifically fashioned to address the impulsive reaction to the child heightened the CARE Center’s concern for the child’s safety when in the mother’s custody. After the third incident in February 2003, Dr. Benton concluded that the prior interventions by OCS had been unsuccessful. He stated that the abuse this child suffered was as “severe as it gets short of actually killing somebody.”
| flBased on the extensive testimonial evidence, including that which we- have highlighted, we find no manifest error in the trial court’s finding that the mother is *630 guilty of physically abusing and medically neglecting the child in a manner that constitutes extreme abuse, cruel and inhuman treatment, and has been life threatening, disabling, and injurious—physically and psychologically—to the child. The testimony of the medical physicians who treated the child, the OWC employees who monitored and supervised the family since the first allegation of abuse was made in June 2000, and family members, including that of the mother and her husband, is clear and convincing evidence sufficient to support the trial court’s finding.
Although the mother urges that the testimony of social worker, Celia Mellad, who has counseled the mother since May 2003, proves that she has reformed and therefore is no longer a threat to the child, we cannot say the trial court erred in discounting Mellad’s testimony and giving greater weight to the testimony of the child’s treating physicians and the other witnesses. We note that despite the mother’s earlier appearance of reformation subsequent to the June 2000 and July 2001 incidents of abuse, the child was again abused at her hands in February 2003. And Mellad’s testimony of the mother’s reformation was circumspect. Several times, Mellad underscored that her recommendation that the mother’s parental rights not be terminated was dependent on implementation of multiple safeguards and the mother’s commitment to change. This equivocal testimony cannot usurp our duty to affirm the trial court’s factual findings. See Stobart v. State Through Dep’t of Transp. and Dev., 618 So.2d 880, 881-82 (La.1993).
ImThe mother urges that the trial court’s failure to expressly state that it found termination of the mother’s parental rights to be in the best interest of the child warrants a reversal.
Where the grounds for termination are proved, then ordinarily termination will be in the best interest of the child. But even after a ground for termination under La. Ch.C. art. 1015 has been proven, the court may, in an exceptional case, refuse to terminate based on a best interest determination. State ex rel. J.T., 38,149 p. 12 (La.App. 2d Cir.12/17/03), 862 So.2d 1130, 1137.
Implicit in the trial court’s judgment terminating the mother’s parental rights is a finding that termination was in the best interest of the child. Additionally, we note the trial court found that (1) the mother’s “treatment of her daughter was life threatening, chronic and has resulted in gravely disabling disfigurement” and (2) “there is no reasonable expectation that [the mother] has been sufficiently reformed to insure [the child’s] safety.” From these findings, we can glean that the trial court determined reunification of the child with her mother was not in the child’s best interest. Moreover, each medical physician who treated the child recommended removal of the child from the mother’s home for the child’s safety. The record clearly and convincingly demonstrates that it was in the best interest of the child to terminate the mother’s parental rights. The trial court’s conclusion is supported by the evidence and, therefore, not manifestly erroneous.
For these reasons, we find no error in the trial court’s termination of the mother’s parental rights based on La. Ch.C. art. 1015(3)(i).
11 TERMINATION OF THE FATHER’S PARENTAL RIGHTS
The petition for termination of the father’s parental rights was asserted on the ground that at least one year had elapsed since the child had been removed from the father’s custody pursuant to a *631 court order; there had been no substantial parental compliance with a case plan for services, which had been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there was no reasonable expectation of significant improvement in the father’s condition or conduct in the near future, considering the child’s age and her need for a safe, stable, and permanent home. See La. Ch.C. art. 1015(5). We further find that termination of the father’s parental rights is in the best interest of the child. See La. Ch.C. art. 1037.
The substantive elements proving lack of substantial parental compliance with a court-approved case plan are enumerated in La. Ch.C. art. 1036 C(6), which provides that La. Ch.C. art. 1015(5) may be evidenced by “[t]he parent’s lack of substantial improvement in redressing the problems preventing reunification.” See also La. Ch.C. art. 1036, Official Comment c (noting this is a relatively new provision that was meant to clarify vague terms such as “no significant, substantial indication of reformation”).
The substantive elements proving lack of a reasonable expectation of significant improvement in the near future are enumerated in La. Ch.C. art. 1036 D(2), which states that this may be evidenced by “[a] pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.”
I^In its dismissal of the petition for termination of the father’s parental rights, the trial court stated:
Because [the father] was systematically not included in [all] case plans, it [cannot] be said that he failed to substantially comply therewith and there has been no earlier interventions,- therefore it [cannot] be said that had there been so, no substantial improvement would have occurred.
Hence, it is impossible for [the father] to attend Family Team Conferences, and case plan meetings if he was incarcerated a large percentage of the time and OCS failed to arrange for his transport thereto. Barring an opportunity to fully participate in [the child’s] case plan it [cannot] be said that ... there is no reasonable expectation of significant improvement.
Therefore, the Court finds that [the father] could not have substantially complied with a case plan for services because he was systematically excluded from those proceedings.
OCS introduced into evidence a Family Team Conference Case Plan, dated May 16, 2003, which was signed by the father. On August 7, 2003, the trial court signed a judgment approving the case plan as it related to the father and ordering compliance. The father neither objected to nor appealed the judgment.
The onus was on the father — who was directly affected by the case plan — to object if he deemed the plan to be unreasonable or if it failed to meet his particular needs. See Mitchell, 2001-2128 at p. 14, 800 So.2d at 818. Moreover, because the trial court approved the plan, the father was expressly given the right to appeal. La. Ch.C. art. 700 B; see also La. Ch.C. art. 710 C (providing right to appeal permanent placement plan). Mitchell, 2001-2128 at p. 14, 800 So.2d at 818. The trial court cannot subsequently render a decision collaterally attacking the August 7, 2003 judgment, which approved the case plan, because it found the father was “systematically excluded” from participation. See Mitchell, 2001-2128 at pp. 14-15,113800 So.2d at 818. Therefore, we find that the collateral attack of the August 7, 2003 *632 judgment interdicted the fact finding process.
When a legal error interdicts the fact finding process, the manifest error standard no longer applies. If the record is otherwise complete, the reviewing court should conduct a de novo review. Landry v. Bellanger, 2002-1443, p. 15 (La.5/20/03), 851 So.2d 943, 954.
The record establishes that when the child was born, the father had recently been released from prison after serving a four-year term for indecent behavior with a minor. By the time of his termination trial, he was again incarcerated for violation of his parole after having served a sentence for subsequent convictions of, according to his testimony, contributing to the delinquency of a minor and having had relations with a juvenile.
When OCS initially intervened in June 2000, the mother was unable to provide information on the whereabouts of the father. The father contacted OCS in September 2000, advising that he could not keep the child or offer an alternative plan for the child’s placement. Although he was advised of an upcoming Family Team Conference, he failed to attend. In March 2003, subsequent to OCS’s February 2003 intervention, the father contacted OCS and, in May 2003, attended a Family Team Conference at which a case plan was established. Among the terms of the May 16, 2003 case plan, approved by the trial court on August 7, 2003, was the stipulation that the father would provide financial support for his child. This required the father to maintain suitable employment and to contribute to the child’s financial support. Another stipulation of the May 16, 2003 case plan was that the father would provide a permanent plan for the child within 15 months and that he |14would give OCS relative resources for an alternative placement. The father was also required under the terms of the case plan to keep OCS aware of his residence in the event that he moved.
Since he agreed to the May 16, 2003 case plan, the father testified that he has attempted to maintain employment. Although he stated that he maintained a job for about a year, OCS case worker, Lynn Farris, was unable to substantiate this employment. The father could not state how much he had earned, but indicated he made $200 a week at one point in time. While he indicated that he had maintained some form of employment from May 2003 until May 2004, he admitted that he never paid any child support. Since his release from prison in January 2003, he has been restricted from living with a minor as a condition of parole. He resides with his girlfriend and relies on her to lend him financial help in between employment. The father has not provided OCS with the names of any relatives for alternative placement of the child, although he apparently has 22 siblings.
While the father has made himself available to OCS, he has not advised of or had a consistent residence. The original address he provided to OCS was not correct; mailings were returned undelivered. When he moved in with his girlfriend, he did not advise OCS of the new address. When arrested for a violation of his parole some time subsequent to the Family Team Conference but before the termination trial, the father failed to advise OCS of the change in his living arrangements.
Based on our de novo review of the evidence, we find the father failed to substantially comply with the case plan and that there is no reasonable expectation of substantial improvement. He has not achieved permanency for his child or ^provided an alternative living arrangement other than that arranged by OCS’s *633 custody. He has not maintained employment or provided financial support for his child. He has spent most of the child’s life in prison and, while nothing in the record establishes that he has harmed the child physically, his convictions are a result of inappropriate sexual conduct with a minor.
We find that the father’s pattern of repeated incarceration renders him unable to care for the immediate and continuing physical and emotional needs of the child for an extended period of time and that there is no a reasonable expectation of significant improvement in the near future. Accordingly, we order termination of the father’s parental rights.
DECREE
For these reasons, that portion of the judgment, which dismisses OCS’s petition to terminate the parental rights of the father, GD, is reversed. In all other respects, including the termination of the parental rights of the mother, DMJ, the judgment is affirmed. Judgment is rendered, terminating the parental rights of GD and certifying the child, DM, free and eligible for adoption. See La. Ch.C. art. 1037 F. Appeal costs are assessed one-half to DMJ and one-half to GD.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.

. The mother of the minor child, DM, is DMJ, and the father is GD, all of whom we identify by their respective initials to protect the minor child. See La. R.S. 46:1844 W(l)(a).