974 So.2d 137 (2008)
STATE of Louisiana IN the INTEREST OF A.D.W, A.N.W and S.S.W.
No. 43,012-JAC.
Court of Appeal of Louisiana, Second Circuit.
January 9, 2008.
*138 Michael Nerren, Indigent Defender Board, for Mother, A.W., Appellant.
Audie L. Jones, Shreveport, for the Department of Social Services, Appellee.
Karen Stubbs, Assistant District Attorney, for the State, Appellee.
Calvin Shirey, for Father, J.D.W., Appellee.
Brad Smitherman, for Children, Appellees.
Before WILLIAMS, GASKINS and PEATROSS, JJ.
GASKINS, J.
A.W., the mother of three minor children, appeals from a trial court judgment terminating her parental rights. We affirm the trial court judgment.

FACTS
The children (A.D.W., born in 2001; A.N.W., born in 2002; and S.S.W., born in 2004) were placed in the custody of the Department of Social Services (DSS) in May 2005 due to allegations of abuse and neglect by the mother and J.D.W., the presumed biological father of A.D.W. and the legal father of the other two children. In particular, the two older children had significant bruising and teeth rotten to the gum line. All three children were adjudicated to be in need of care. DSS established a plan for reunification for the family after the children were placed in foster care.
In January 2007, DSS filed a petition for termination of the parental rights of both parents. Following a hearing in July 2007, *139 the trial court rendered written reasons in August 2007. J.D.W.'s rights were terminated following a showing that he had failed to work the case plan. The trial court found that he has abandoned the children.
As to the mother, the court noted that she initially made efforts to comply with portions of the plan. However, the court found that she failed to show "substantial measurable progress as it relates to the parenting classes and anger management class." During her visits with the children, she failed to implement the techniques taught in those classes. According to the case workers, the mother inappropriately disciplined and even hit one of the children during supervised visitation. The trial court expressed concern for the safety of the children given the mother's noncompliance even in a supervised environment.
The trial court considered the evidence submitted by Dr. John Simoneaux; he testified that he evaluated the mother in August, 2006 and later in June 2007. He found little change in the mother in the period between his evaluations. Dr. Simoneaux did not believe that she recognized her alcohol abuse problems.
The trial court also found that the mother had failed to keep DSS informed of her whereabouts and that she had not established a home suitable for the children. It further noted the mother's criminal conviction for manslaughter in 1990; this arose from the mother killing her eldest child, R.W., in August 1989, by placing the crying infant in a freezer.
After concluding that the evidence showed by clear and convincing proof that the children could not be safely returned to the mother and that the mother had failed to make substantial, measurable progress in the 19 months since the children were removed from her care, the trial court ordered the termination of her parental rights. Judgment in conformity with the court's ruling was signed on August 29, 2007.
The mother appealed.

LAW
Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. State ex rel. A.T., XXXX-XXXX (La.7/6/06), 936 So.2d 79.
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. Parents have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children. These interests warrant great deference and require full, vigilant due process protection that fair procedure be followed when the state seeks to terminate the parent-child legal relationship. Balanced against those protections is the child's profound interest in terminating parental rights which prevent adoption, and hamper the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing the parents' and the child's interests, the courts of this state have consistently' found the interests of the child to be paramount over those of the parents. State ex rel. L.B. v. G.B.B., XXXX-XXXX (La.12/4/02), 831 So.2d 918.
The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and *140 adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the state remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. State ex rel. L.B. v. G.B.B., supra; State ex rel. C.M.M. v. T.P.M., 42,238 (La.App.2d Cir.5/9/07), 957 So.2d 330.
Termination of parental rights is a severe and terminal action, so the legislature has mandated that, in order to terminate these rights, the state must satisfy an onerous burden of proof. Namely, it bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. La. Ch. C. art. 1035; State in Interest of D.G. v. Danny G., 30,196 (La.App.2d Cir.10/29/97), 702 So.2d 43; State ex rel. B.H. v. A.H., 42,864 (La.App.2d Cir.10/24/07), 968 So.2d 881. Although there are several statutory grounds for involuntary termination of parental rights set forth in La. Ch. C. art. 1015, only one ground need be established. State ex rel. SAW v. Mitchell, 2001-2128 (La.11/28/01), 800 So.2d 809; State in Interest of D.G. v. Danny G., supra. Even upon finding that the state has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests. La. Ch. C. art. 1039; State ex rel. C.M.M. v. T.P.M., supra.
La. Ch. C. Art. 1015 provides, in relevant part:
The grounds for termination of parental rights are:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
In termination of parental rights cases, the trial court's factual findings, including the finding that a parent is unfit and there is no reasonable expectation of reformation, will not be set aside in the absence of manifest error. State ex rel. B.H. v. All., supra.
Children have a need for permanency. Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child. State ex rel. C.M.M. v. T.P.M., supra.

EVIDENCE
Dr. Ann Springer, an expert in pediatrics and in child abuse and neglect, testified that she examined the children in May 2005 when they came into DSS custody. A.D.W. was almost four years old; he had multiple teeth which were rotten to the gum line and his speech was almost unintelligible. The area around his mouth showed signs of old and new injuries; Dr. Springer testified that the evidence indicated multiple episodes of being hit in the mouth. He was not developmentally on scale for his age in areas of fine motor *141 control, speech, language and possibly cognition. A.N.W. was two and a half years old; she likewise had teeth rotted to the gum line. She also had abnormal motor development and pattern bruising on her lower back above the diaper line. The doctor concluded that A.N.W.'s bruising, like her brother's, was caused by nonaccidental trauma. S.S.W., an infant of eight or nine months, had conjunctivitis, and both of her ears were infected.
All three of the case workers who supervised the mother's case testified at the hearing. They affirmed that the mother visited with the children regularly and that she completed classes in parenting and anger management. However, each recounted that, even after completing these classes, the mother was unable to demonstrate that she had benefitted from them and learned anything. She still required close monitoring during her supervised visitation with the children at the agency office. As recently as three or four months before the hearing, she had angrily "gotten in the face" of the current case worker in a dispute over a phone call.
The case workers testified as to the mother's erratic behavior during her visits with the childrensometimes she was able to act appropriately, sometimes she could not. Even in these controlled situations where she knew she was under scrutiny, the mother still repeatedly lost control. The first case manager described the mother as shaking the children in front of her. She noted that even after the mother completed portions of the case plan like the parenting and anger management classes "on paper," she could not demonstrate that she had learned anything. The second case worker recounted the mother pulling her hand back to spank the oldest child several times; on one occasion, she actually struck him. According to this case worker, this incident occurred even after she had instructed the mother that corporal punishment could not be used on the children. She arranged for the mother to receive counseling sessions to try to teach her parenting skills. The third and current case manager testified that the mother admitted that she "popped" the second oldest child during a visit; she also got in the children's faces and screamed at them. She was only able to note some recent improvement in the mother's behavior. While all of the case workers commented upon the mother's inability to control the children, the first case worker noted that the foster parents who are currently caring for the children had no problems controlling them; she also observed that the children bonded with these foster. parents unusually quickly.
In addition to attending parenting and anger management classes and supervised visitation with the children, the mother was also required to keep DSS informed of her whereabouts and circumstances and to establish a suitable home. The case workers indicated that the mother did not always keep them informed of where she was living. She also refused to allow the case workers to verify her housing or visit her home, usually stating that whoever she was living with did not want DSS in their home. The testimony was consistent that the mother never established a stable home.
Dr. John C. Simoneaux, a clinical psychologist, testified that he evaluated the mother twice, in August 2006 and again in June 2007. He noted that during their initial interview she was "defensive of everything"; among other things, she minimized the children's dental problems and speculated that the social worker had something against her. Given the fact that she was drinking at the time she killed her first child and that she served a prison sentence for the child's death, Dr. *142 Simoneaux expressed surprise that she was still drinking. The mother insisted that her drinking was not severe; she denied having any alcohol-related problems. The doctor found that she had borderline personality traits. He opined that she had problems with parenting due to her personality problems and that just learning parenting in classes was not the issue. He also described her as hedonistic.
During the first evaluation, Dr. Simoneaux noted that, despite all the problems in her life, which included her children's placement in foster care, her relationship problems with her husband and a lack of a place to live, the mother was surprisingly stress free. She did not appear to be disturbed by the fact that she did not know where she would be sleeping that night.
When he saw her again the following year, the mother had improved in only two areasshe was no longer unemployed, having gotten a job in a fast food restaurant, and she had a place to stay, living with an older woman whom she was taking care of. However, she was already expressing discontent with the job, and she was somewhat vague about the housing situation. As to her alcohol problems, she said she was attending AA meetings; however, she could not tell Dr. Simoneaux how long she had been sober. Also, she was dating a man she met at an AA meeting; Dr. Simoneaux was troubled that she was minimizing his drinking as she had done her husband's.
Dr. Simoneaux was concerned about the mother's judgment. The testing he administered revealed that the mother has a full scale IQ of 76. Her profile as revealed by testing was more "troublesome" than when he evaluated her the first time. It reflected her impulsivity, poor judgment, inability to delay gratification, and low tolerance for frustration. According to Dr. Simoneaux, her low tolerance for frustration is seen in her visitations with the children when she is unable to control herself even when she knows she is under scrutiny. He also diagnosed the mother as being narcissistic. He noted that between his first and second evaluations the mother had become more ingrained in her belief that everything wrong in her life is someone's else fault. According to Dr. Simoneaux, a narcissistic personality disorder is one of the most difficult disorders to treat. He did not foresee any significant improvement in the mother's situation in the near future.

DISCUSSION
The mother argues that she has substantially and successfully complied with the case plan by completing the classes required of her, regularly attending visitation with her children, and attending AA meetings which she maintains are unnecessary. She also contends that she has benefitted from the classes she took and has shown improvement in her behavior toward the children.
The mother's performance of the case plan cannot be characterized as successful under the circumstances presented in this case. Despite completion of the mandated parenting classesand her attendance of additional parenting sessions which were deemed necessary as a result of her failure to benefit from the initial classesshe has not demonstrated a consistent ability to interact with her children appropriately even under controlled and supervised conditions. Although she completed anger management classes within a few months of the children's placement in foster care, the case workers repeatedly observed inappropriate bursts of anger in which the mother lashed out not only against the children but also against the case workers. She has also failed to recognize and take responsibility for her alcohol abuse, a circumstance which played a role in the death of her oldest child.
*143 The mother is dismissive of her killing of the oldest child as an issue in this matter, arguing that it occurred years before these children were born and that she served her prison sentence. (She is currently on parole for her manslaughter conviction and will remain so until 2010.) She contends that the state failed to show that her homicidal actions as a teenager adversely affected her ability to raise these children. The state argues that once a parent murders one child, he or she loses the benefit of the doubt about his or her parenting abilities.
DSS is rightly concerned by the mother's killing of her oldest child in 1989 and fearful of what she might do to these children. This is especially true since the two children entered. DSS custody with evidence of having been battered. The mother's alcohol consumption was a factor in the death of the oldest child. Even though she was told to attend AA meetings in September 2005, she cannot prove any compliance with this requirement until May 2007, two months before the termination hearing.
We agree with the trial court that the state carried its burden of proving by clear and convincing evidence that the mother failed to substantially comply with the case plan and that there is no reasonable expectation of significant improvement in her condition or conduct in the near future. Even if the mother's assertions are true that she has shown some degree of improvement in recent months, these children have already languished in foster care for more than two and a half years.[1] Given the expert testimony of Dr. Simoneaux that she is unlikely to improve significantly in the near future and that narcissism makes her virtually untreatable, we find no manifest error in the trial court's decision.
The record reveals that termination of the mother's parental rights is in the best interest of the children. In their mother's care, the children were subjected to physical abuse which left bruises and scarring; they also were neglected to the point that they suffered severe health ramifications, including teeth rotted to the gum line. The children have bonded with their foster parents who are willing to adopt them.
We find no manifest error in the trial court's decision to terminate the mother's parental rights, thereby freeing these children to be adopted into a safe, stable, and permanent home.

CONCLUSION
The judgment of the trial court terminating A.W.'s paternal rights to her three children is affirmed. Costs are assessed against A.W.
AFFIRMED.
NOTES
[1] We observe that the two younger children have spent at least half or more of their young lives in foster care.